```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                         LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:21-CR-00089-BJB
 4                                  )
             Plaintiff,             )
 5                                  )
     v.                             )
 6                                  )
     SALVADOR ABDUL JONES,          )
 7                                  )    October 6, 2022
             Defendant.            )    Louisville, Kentucky
 8

 9                           *  *  *  *  *

10                              VOLUME 2
          TRANSCRIPT OF TESTIMONY OF DETECTIVE TIM O'DANIEL
11                           AT JURY TRIAL
              BEFORE HONORABLE BENJAMIN BEATON
12                    UNITED STATES DISTRICT JUDGE

13                           *  *  *  *  *

14   APPEARANCES:
     For United States:        Alicia P. Gomez
15                             Emily Lantz
                               U.S. Attorney's Office
16                             717 West Broadway
                               Louisville, KY 40202
17
     For Defendant:            Patrick J. Renn
18                             Smith & Helman
                               600 West Main Street, Suite 100
19                             Louisville, KY 40202

20   [Defendant present.]

21
                             Dena Legg, RDR, CRR, CCR-KY
22                           Official Court Reporter
                             232 U.S. Courthouse
23                           Louisville, KY 40202
                               (502) 625-3778
24
     Proceedings recorded by certified stenographer, transcript
25   produced by computer.
```

```
 1              (Begin testimony in open court at 9:31 a.m.  Jury out.)

 2              (DETECTIVE TIM O'DANIEL, called by the Government, sworn.)

 3                   THE COURT:  Have a seat, sir.

 4                   THE WITNESS:  Yes, Judge.

 5                   THE COURT:  All right.  Today we're gonna continue

 6     your sworn testimony that began on Tuesday.  I won't -- because

 7     you are under oath, I won't ask you how Michigan was because I

 8     don't want to invite any erroneous answers, but thank you for

 9     being here.

10                   THE WITNESS:  Yes, Your Honor.

11                   THE COURT:  I don't think we should have any trouble

12     getting you out of here about the time when you need to leave.

13         A couple quick notes for you:  Because of the unusual nature

14     of your stepping down and coming back a day and a half later, on

15     one slide, slide 7 of your new presentation, we've removed the

16     words "car drop" --

17                   THE WITNESS:  Okay.  That's fine.

18                   THE COURT:  -- but that location is still there.  We

19     haven't discussed that part of the evidence.

20                   THE WITNESS:  I'm sorry.

21                   THE COURT:  That's fine.  The more important thing I

22     want to note is, as you know, the presentation -- the slide deck

23     that we're gonna use this morning is substantially pared down

24     from what we discussed on Tuesday and what was disclosed on

25     Friday.  We've discussed at some length some important legal
```

1    limitations on the scope of that testimony.

2            THE WITNESS:  Yes, Your Honor.

3            THE COURT:  And most notably, we won't be discussing

4    the TRAX software and any sort of algorithmic radius

5    determinations for these cell sites.  So I'm not gonna try to

6    say any more than that because I don't want to mess up the facts

7    or the tech or anything like that, but I'll just remind you that

8    when Ms. Gomez asks you questions, please listen carefully.

9    She's gonna work to stay within the -- sort of the four corners

10   of this presentation and its summary.  Mr. Renn's gonna do the

11   same.  Don't infer that we're talking about the original

12   presentation.  Just listen carefully, and I think you'll find

13   that if you do, it will be easy enough to follow the basic

14   points that are set out on the new presentation.  Okay?

15           THE WITNESS:  Yes, Your Honor.

16           THE COURT:  Does that make sentence?

17           THE WITNESS:  Yes, Your Honor.

18           THE COURT:  All right.  Anything else before we bring

19   in the jury?

20           MR. RENN:  No, Your Honor.

21           MS. GOMEZ:  Just to make it clear, we're not talking

22   about TRAX at all.

23           THE COURT:  Right.

24           MS. GOMEZ:  No mention.

25           THE COURT:  Right.  Okay.  Let's bring in the jury.

1     (Jury in 9:33 a.m.)

2          THE COURT:  Good morning everyone.  Welcome back.  Did

3     you-all enjoy the doughnuts and steak and biscuits and

4     everything that we got for you this morning?

5          A JUROR:  It was delicious.

6          A JUROR:  It must have gone to the wrong room.

7          THE COURT:  You didn't get it?  Well, yeah, I guess we

8     paid the price for starting late today.  Well, I'll see what I

9     can do about tomorrow.

10     I hope everyone had a good evening, an easy morning.  Thanks

11    for being back right on time, bright-eyed and busy-tailed this

12    morning.  We are going to resume the testimony of a witness who

13    you began to hear from on Tuesday and now is back, and we'll

14    pick up his testimony and then cross-examination from there.

15     So welcome.  Thank you and we'll get started.

16                         DIRECT EXAMINATION

17    BY MS. GOMEZ (CONTINUED):

18    Q.   Detective O'Daniel, just to kind of go back a little bit,

19    since it's a little bit since the jury heard from you, you

20    indicated before that you had reviewed the search warrant return

21    for a phone number 615-351-3671; is that correct?

22    A.   Yes, ma'am.

23    Q.   Okay.  And is that return that has been previously

24    introduced as Government's Exhibit 40A -- 40A and 40B, but if we

25    could pull up 40A for you to see.  This is Government's 40A,

1    yes.

2        Okay.  Did you prepare a presentation utilizing this Excel

3    spreadsheet?

4    A.  Yes, ma'am.

5    Q.  Okay.  And if I could -- what information did you utilize

6    from this Excel spreadsheet to create these slides we're about

7    to see?

8    A.  I just went to the -- if I can circle it --

9    Q.  Yes, absolutely.

10   A.  -- the latitude and longitude of the specific cell site

11   during what the detective thought was important.  So basically

12   -- and this is just an example -- this information right here,

13   if you see, this is the tower latitude and the tower longitude.

14   I went to a map, typed that information in and just noted that

15   that was the cell site during -- you know, during a specific

16   call.

17   Q.  Okay.  And I want to show you a presentation you prepared,

18   Government's Exhibit Number 60.

19              THE REPORTER:  Is this admitted?

20              MS. GOMEZ:  Not yet.

21   BY MS. GOMEZ:

22   Q.  Is this the presentation that you prepared for the jury

23   today?

24   A.  Yes, ma'am.

25   Q.  Okay.  Does it fairly and accurately depict the information

1  you're about to testify to that you got from the cell site or

2  the -- sorry -- from the cell records, the cell phone records?

3  A.  Yes, ma'am.

4  Q.  Which was Government's Exhibit 40A and B?

5  A.  Yes, ma'am.

6       MS. GOMEZ:  Okay.  Your Honor, I would move to publish

7  and -- introduce and publish Government's Exhibit 60.

8       MR. RENN:  Subject to the previous objections, Your

9  Honor.

10      THE COURT:  Okay.  Admitted.

11   (Government Exhibit 60 admitted in evidence.)

12 BY MS. GOMEZ:

13 Q.  Let's go ahead and publish it.

14   Okay.  If you could explain to the jury what they're looking

15 at here.  What is this?

16 A.  So these are -- the pink balloons that you see are --

17 Q.  Will you circle it.

18 A.  Yes.  If you see these right here --

19 Q.  Okay.

20 A.  -- these are the cell sites.  So I -- again, I went to the

21 actual search warrant return.

22 Q.  All right.  We're gonna flip back and forth, if that's okay,

23 just to help.

24 A.  Sorry.  Yeah.

25 Q.  Okay.  You went -- is this what you looked at?

1   A.   Yes.

2   Q.   Okay.

3   A.   For example --

4   Q.   Let's go to line 484.

5   A.   484?

6   Q.   Okay.  No, go ahead.

7   A.   So I went there.  I went to here and I looked at the

8   latitude and longitude of the cell site.  I went to a map, typed

9   in the latitude and longitude and noted that that was for

10  line 484, and that will be seen here.

11  Q.   Okay.  So that line 484 -- sorry.  This line here where you

12  say lines 484 through 490, does that on this map correspond with

13  the Government exhibit we just showed with the cell phone

14  records?

15  A.   Yes.  If you flip back, I can show, yes.  So if you go --

16  this is -- here's line 484 and here's line 490.  They're all at

17  the same latitude and longitude.

18  Q.   Okay.  And then does it -- what you have mapped, does that

19  correspond with the specific days and times that are listed on

20  this Excel spreadsheet?

21  A.   Yes.  So these records, again, are provided.  They have the

22  date.  They also have the time, but these records are provided

23  in the UTC, which is the Zulu time or Prime Meridian time; and

24  so you will have to subtract or I will have to -- I subtract

25  four hours from that.  So we're looking --

1    Q.   Four hours from that to be on what time zone?

2    A.   I'm sorry.  To be on the Eastern Time zone.

3    Q.   Okay.  So if this says, for example -- gosh, every time.

4         Okay.  So if this says -- I should do -- let me switch

5    colors.  Give me a second.  If that says 16:38:42 at line number

6    490, tell me what time that would be in Eastern Time.

7    A.   That would be 12:38:42.  So 12:00 p.m.

8    Q.   Okay.  Thank you.

9         Okay.  Let's go back to your map.  So tell me, each of

10   these -- so, again, going back, you indicated that this is --

11   what I'm circling here are cell towers; is that correct?

12   A.   Yes, ma'am, cell sites, yes, ma'am.

13   Q.   Or cell sites.  Okay.  And what is this address you included

14   here?

15   A.   This was the address that was provided to me as the incident

16   address.

17   Q.   Okay.  The first bank robbery?

18   A.   Yes.

19   Q.   Okay.  And just to be clear, when you receive cell phone

20   records, you can't say that a particular person is using that

21   phone; is that correct?

22   A.   No, ma'am.

23   Q.   Okay.  And you can't say that this person is standing where

24   that tower is; is that correct?

25   A.   No.  The device is utilizing that, that cell site per

1    T-Mobile's records.

2    Q.  Okay.  So essentially, correct me if I'm wrong, but is it

3    accurate that we can only derive from this that the cell phone

4    is using that tower during the time on the records and that's

5    really it?

6    A.  Yes, from the CDR, yes.

7    Q.  Okay.  All right.  I want to look at the second slide.

8         All right.  What are we looking at here?

9    A.  Again, the pink balloon here and here, if you go to

10   line 1747 and 1749, they should reflect --

11   Q.  Give me a second.  Okay.  So 1747, you indicated -- we're

12   looking at it here.  Can you tell from looking at the records,

13   is that -- what kind of action was the phone taking at that

14   time?

15   A.  On -- excuse me -- on the 8th of April 2021 at 12:36:53

16   Eastern Time -- excuse me --

17   Q.  Are you talking about this line right here?

18   A.  Yes.

19   Q.  Sorry.

20   A.  -- the phone was receiving an incoming call from

21   502-600-1549 and that is reflected with this cell site here at

22   this latitude and longitude and then that address.

23   Q.  And you can, again, only say that the phone used that tower

24   to make the call?

25   A.  Yes, it was -- it was utilizing that tower to receive the

1    call.

2    Q.   Okay.  Or receive the call.  Thank you.

3    A.   Yes.

4    Q.   So when we see "incoming," does that mean receive the call?

5    A.   Yes, someone's making -- that device is having an incoming

6    call, which someone is calling that device.

7    Q.   And then, obviously, when it says "outgoing," what does that

8    mean?

9    A.   That's the device making an outgoing call.

10   Q.   Okay.  And what about when it doesn't have incoming or

11   outgoing?

12   A.   You can see some of these are text messages.

13   Q.   Okay.

14   A.   SMS.  And for some reason the network didn't pick up.

15   Either -- on those, either it wasn't available to the service.

16   It just -- the data just isn't there.  I'm sorry.

17   Q.   Okay.  But that -- but you don't populate this data;

18   correct?

19   A.   No, no.  This is all provided from T-Mobile.

20   Q.   T-Mobile.  All right.  Let's go back to the presentation.

21   So slide number 3.  Oh, I'm sorry.  On that past one, on slide

22   number 2, this address here -- why did you flag that address

23   here?

24   A.   This address was provided, again, by the detective as a

25   significant -- or to the incident location.

1  Q.  Okay.  Thank you.  Slide number 3.  Again, here?

2  A.  Again, this is a cell site that was used where that was

3  reflective in T-Mobile's records, lines 4614 and 4617.

4  Q.  Okay.  Let me switch to the records.  4614.  So here, the

5  two highlighted columns, if you could let the jury know what

6  they're seeing here in terms of activity.

7  A.  So, again, on the 22nd of May 2021 at 9:48:39 Eastern Time,

8  there was an outgoing text message.  You can -- from our -- the

9  target number to -- I'm looking right here -- to this phone

10 number.  And this is the latitude and longitude that was mapped

11 and then that's the actual address.

12 Q.  Okay.

13 A.  I'm sorry.  The latitude and longitude of the cell site.

14 Q.  Okay.  Thank you.

15      All right.  So that was -- let's go back to slide number 3.

16 Okay.  And, again, this address here?

17 A.  Was provided by the detective of the incident address.

18 Q.  Okay.  Slide number 4, is this address located in

19 Louisville, Kentucky?

20 A.  No, ma'am.

21 Q.  Okay.  Where is this?

22 A.  This is New Albany.

23 Q.  Okay.

24 A.  Indiana.  I'm sorry.

25 Q.  Okay.  So you pulled the map of New Albany, Indiana.  What

 1   is the significance of this address?

 2   A.  This was the incident location that was provided by the

 3   detective.

 4   Q.  Okay.  And what are we looking at with that?

 5   A.  Again, that's the -- I'm sorry -- the cell site.  If you go

 6   to line 6534 --

 7   Q.  Okay.

 8   A.  -- this was the GPS coordinates that were provided for the

 9   cell site from T-Mobile.

10   Q.  6534.  And, again, the date on that is what?  Right here,

11   what's that date?

12   A.  It's April 29th of 2021.

13   Q.  Okay.  And what's the activity here?

14   A.  It's receiving an incoming text message.  Our target number

15   is receiving an incoming text message from this number, and this

16   is the cell site latitude and longitude and the address.

17   Q.  Okay.  Of the cell site?

18   A.  Yes, of the cell site, yes.

19   Q.  Okay.  Now, this next slide, again, the significance of this

20   address?

21   A.  Yes, this is an address that was provided by the detective

22   as significant of its -- of the incident location.

23   Q.  Okay.  And what is that that we're looking at?

24   A.  Again, this is -- excuse me -- the GPS coordinate of the

25   cell site, and it was reflected in line 6687.

1    Q.   Okay.  Let's look at line 6687.  What's the date on that?

2    A.   That is the 30th of April 2021.

3    Q.   Okay.  And what's the time on that?

4    A.   It will be 10:14:36 --

5    Q.   Okay.

6    A.   -- p.m. or -- I'm sorry -- a.m. in Eastern Time.

7    Q.   Okay.  So you said it's -- say that again.  I'm sorry.  What

8    was the time?

9    A.   It's 10:14:36 a.m.

10   Q.   10:00 in the morning?

11   A.   Yes, ma'am.

12   Q.   Okay.

13   A.   Sorry.

14   Q.   Go ahead.

15   A.   And then it's receiving an incoming text message and

16   utilizing the cell site at this GPS coordinate, and this is the

17   address of the cell site.

18   Q.   Okay.  Now here, what is the significance of this address?

19   A.   This was the address provided by the lead detective as an

20   incident location.

21   Q.   Okay.  And what are we showing with that pink pin there?

22   A.   Again, that's the cell site, the GPS coordinates of the cell

23   site.

24   Q.   Okay.  And is that reflected on the lines indicated on

25   there?  What lines are reflected?

1    A.   I'm sorry.  It's 9038, 9040, 9042, 9044, 9048, 9050.

2    Q.   Okay.  The 9038, what's the date here?

3    A.   That's the 5th of May of 2021.

4    Q.   Okay.  And tell the jury what time this is again.

5    A.   That will be 11:30:17 in the morning.

6    Q.   Okay.

7    A.   Eastern Time.

8    Q.   Go ahead.

9    A.   I'm sorry.  Go ahead.

10   Q.   Tell me what we're looking at here in terms of cell phone

11   activity for the ones listed on here.  It's 9038 you said.  What

12   would be the cell phone activity for that?

13   A.   9038 is the -- is an incoming text message utilizing the

14   cell site with this GPS coordinate -- sorry -- this one, and

15   this is the address of the cell site.

16   Q.   Okay.  These GPS coordinates we're looking at here, are they

17   all the same?  Not that one.

18   A.   Yes.

19   Q.   Okay.  And I think I already covered this, but in case I

20   didn't, what's the significance of that address?

21   A.   Again, that's the incident address that was related by the

22   lead detective.

23   Q.   Okay.  All right.  Next, what is here?

24   A.   That's the cell site GPS coordinates for lines 9053, 9055,

25   9056, 9057.

1　Q.　Okay.  Does that show the 9053, 9055, 9056, and 9057 you

2　were just talking about?

3　A.　Yes.

4　Q.　Okay.  What kind of activity is happening there?

5　A.　Just, for example, this -- in the 9053, at this time -- and

6　that is 11:39:17 in the morning -- it's receiving an incoming --

7　I can't see it.  Can you delete the blue line?

8　Q.　Oh, yeah.  Sorry.  Go ahead.

9　A.　I believe it's receiving an incoming text message at this --

10　utilizing this cell site at this address.

11　Q.　Okay.  So here when you -- when you're talking about the

12　text messages, is it the same as a phone call?  Like, incoming

13　means receiving and outgoing means sending?

14　A.　Yes.

15　Q.　Okay.  And this map, where is this?  What are we looking at

16　here?  Like, what is this area that's on the map?

17　A.　This is a view of Louisville, downtown Louisville.

18　Q.　Okay.  Are you familiar -- for example, what are we seeing

19　here, just so the jury can locate where in downtown Louisville

20　we're looking at?

21　A.　Yes, so that circle area, this area right here is Slugger

22　Field.  It's the baseball field.

23　Q.　What about this intersection?  Does it have, like, a common

24　name?

25　A.　Spaghetti Junction.

1    Q.   Okay.  So that area there is downtown Louisville you said;

2    correct?

3    A.   Yes, ma'am.

4    Q.   Okay.  And this last slide, it says "Nashville" kind of

5    small here on the map, but it looks like you wrote it smaller

6    just to -- what was the purpose of that?

7    A.   Just so it was easily viewable.

8    Q.   Okay.  Just so the jury could tell that this was Nashville?

9    A.   Yes.

10   Q.   Okay.  And, again, what is this pink pin that we're looking

11   at there?

12   A.   Again, this is the GPS coordinate for the cell site for line

13   number 9118, 9119, 9120, and 9121.

14   Q.   Okay.  And when we look at the records -- okay.  What is the

15   date on that activity?

16   A.   That is May 5th, 2021, at 5:55:50.  For example, 9118 at

17   5:55:50, again, this is the GPS coordinate for the cell site and

18   this is the address for the cell site.

19   Q.   Okay.  And what kind of activity is right there?

20   A.   It's an incoming -- incoming text message.

21   Q.   Okay.  Since there are several, are they incoming text

22   messages?

23   A.   Yes.

24   Q.   Okay.

25   A.   I'm sorry.

1    Q.  No, that's fine.  And just to be abundantly clear on this,

2    are you able to say that a particular person is holding that

3    phone?

4    A.  No.

5    Q.  Using that phone?

6    A.  No.

7    Q.  And are you able to say where that phone is located, what

8    distance it is from this site?

9    A.  No.

10   Q.  And Government's Exhibit 40B, if we could pull that up real

11   quick.  That has previously been introduced.  From the cell

12   phone returns, was the subscriber of this cell phone identified

13   that we looked at these records for?

14   A.  That's the -- the account name or name on the account is

15   Salvador Jones.

16   Q.  Okay.  For these records we just looked at?

17   A.  Yes.

18          MS. GOMEZ:  I don't have any other questions.  Thank

19   you.

20                        CROSS-EXAMINATION

21   BY MR. RENN:

22   Q.  Good morning, Detective O'Daniel.

23   A.  Good morning, sir.

24   Q.  Welcome home.

25   A.  Thank you, sir.

1    Q.  You testified that much of the records that you were

2    utilizing here were the T-Mobile records; is that correct?

3    A.  Yes, sir.

4    Q.  And those were identified by the Government as 40A and 40B;

5    is that correct?

6    A.  Yes, sir.

7    Q.  And it's your understanding that those records were obtained

8    pursuant to a warrant; is that correct?

9    A.  Yes, sir.

10   Q.  And in order to get a warrant, you have to present an

11   affidavit to a judge; is that correct?

12   A.  Yes, sir.

13   Q.  And basically establishing probable cause to obtain those

14   records; is that correct?

15   A.  Yes, sir.

16   Q.  And the person that does the affidavit, again, fills out a

17   sworn statement; is that right?

18   A.  Yes, sir.

19   Q.  And in this case here, you weren't the affiant?  You did not

20   fill out the affidavit in this case; is that correct?

21   A.  No, I was not.

22   Q.  And were you present when the judge signed the warrant?

23   A.  I was not.

24   Q.  And as far as -- we talked about the return, getting those

25   records.  And in this case here, did you receive the return of

1    those records?

2    A.   Not from T-Mobile -- I'm sorry -- not from T-Mobile, sir.

3    Q.   Okay.  So some other LMPD officer, I suppose, got the

4    return; is that correct?

5    A.   Yes, sir.

6    Q.   Do you know who that was?

7    A.   So they -- there was -- at the time there was a unit that

8    would submit these types of search warrants, and that unit would

9    receive it.  There's -- they have a sheet that you fill out, and

10   someone in that unit sends it.  They receive it, and then they

11   forward those results back on to the lead detective, but I don't

12   know specifically who it was.

13   Q.   But ultimately you ended up with the records, obviously; is

14   that correct?

15   A.   Yes, sir.

16   Q.   And when you were testifying on Tuesday, you were talking

17   about cell towers and then, you know, said the correct term is

18   "cell sites"; is that correct?

19   A.   Yes.

20   Q.   And, basically, there are hundreds if not thousands of those

21   around the Jefferson County area.  Would that be fair to say?

22   A.   Absolutely.

23   Q.   And a cell phone, even though we can do a bunch of different

24   things with it, is basically a radio.  Would that be fair to

25   say?

1    A.   Yes.

2    Q.   And the radio frequency of the cell phone ultimately

3    connects to one of these cell towers or cell sites; correct?

4    A.   Yes, sir.

5    Q.   And that's what you were talking about with these records

6    and showing there on the map; is that correct?

7    A.   Yes, sir, these were -- yeah, this is what -- T-Mobile is

8    saying what cell site was used during a specific time.

9    Q.   And, again, hundreds of these all around the area, and the

10   cell phone is going to connect to one of these cell sites?

11   A.   Yes, sir.

12   Q.   And, again, we're talking about the phone, not any person;

13   is that correct?

14   A.   Yes, sir.

15   Q.   And I think you talked about on Tuesday something called a

16   handoff or a holdover; is that correct?

17   A.   Yes, sir.

18   Q.   And that would be similar to if I am, like, in Bullitt

19   County and then if I am traveling down here to the courthouse

20   and I'm on my cell phone, that I'm gonna pass through a number

21   of various cell sites.  Would that be fair to say?

22   A.   Yes, sir.

23   Q.   And my phone connecting to these various cell sites

24   basically isn't always gonna pick up the closest one; is that

25   correct?

1    A.  It's depending on geography, buildings, things of that

2    nature, yes.

3    Q.  Weather?

4    A.  Weather, yes, sir.

5    Q.  The repair or disrepair of a cell site?

6    A.  Yes, sir.

7    Q.  So all those things are going to affect which cell site my

8    cell phone may connect to; is that correct?

9    A.  Yes, sir, but like you said, there are thousands of these.

10   If you are, for example, in Bullitt County, you wouldn't connect

11   to the cell site that is near the federal courthouse.  You would

12   connect to the next cell site most likely in Bullitt County.

13   Q.  But the cell site, not distance, with the strongest signal;

14   is that correct?

15   A.  Yes, sir.

16   Q.  Okay.  And, again, that distance can vary, again, depending

17   on the particular cell site; correct?

18   A.  Sorry.  I'm -- that distance can vary --

19   Q.  Strike that.  Poor question.  My apologies.

20   A.  Sorry.

21   Q.  The cell phone -- again, I think you answered this on direct

22   examination in talking with Ms. Gomez -- that even though the

23   phone may be in this particular location at 601 West Broadway,

24   that doesn't mean that if this is the cell site that's where the

25   telephone is; is that correct?

1    A.  No, sir, you can't -- you can't gather that information from

2    the records, no.

3    Q.  It could be a mile, two miles away; is that correct?

4    A.  It could be, but especially in a city with -- especially

5    with all the large buildings that are around here, it's gonna --

6    in my experience, it would be tough to pick up on a cell site

7    that far away within a city but --

8    Q.  In your experience -- how many times have you testified in

9    federal court?

10   A.  To cell site information?

11   Q.  Yes, sir.

12   A.  This is my first time.

13   Q.  Okay.  And what about your educational background?  Are you

14   an engineer?

15   A.  I am not, no.

16   Q.  Mathematician?

17   A.  I am not.

18   Q.  Where did you attend high school?

19   A.  I went to Seneca High School in Louisville, Kentucky.

20   Q.  And what about college thereafter?

21   A.  I left Seneca High School, joined the U.S. Marine Corps and

22   did that for some time and then got out and went to the

23   University of Louisville.

24   Q.  And did you graduate University of Louisville?

25   A.  No, sir.  I'm a few classes shy.  I became a cop instead.

1    Q.   Okay.  And what kind of course of study were you pursuing at

2    the University of Louisville?

3    A.   Political science.

4    Q.   You weren't pursuing any math; is that correct?

5    A.   No, sir.

6    Q.   You weren't pursuing any engineering degree?

7    A.   No, sir.

8    Q.   Or any of the other hard sciences that we would talk about?

9    A.   No, sir.

10   Q.   Okay.  Now, a cell site is basically a 360 circle as far as

11   receiving signals.  Would that be fair to say?

12   A.   Yes, sir.

13   Q.   And it's broken into -- excuse me -- separate sectors; is

14   that correct?

15   A.   The vast majority of them are, yes, sir.

16   Q.   And each one of those breaking out into a cone out to

17   120 degrees; is that correct?

18   A.   Yes, sir.

19   Q.   And so it depends on which location or which sector you're

20   hitting, again, as to each particular site.  That is a factor;

21   is that correct?

22   A.   Yes.

23   Q.   And most of us with an iPhone have GPS; is that correct?

24   A.   Yes, sir.

25   Q.   And there's a technology Find My iPhone; is that correct?

1    A.   Yes, sir.

2    Q.   What you're talking about and what you testified is not GPS;

3    is that correct?

4    A.   No, sir.

5    Q.   That is the most accurate way to identify where a phone

6    might be; correct?

7    A.   Through what means?  If you're looking -- I've -- in my

8    experience, I've had some issue with Find My iPhone.  It's still

9    a broad area, and it's not -- it's not pinpoint.

10   Q.   It's not pinpoint, but it's a whole lot better than pinging

11   a phone, is that correct, the way that you've just described

12   here today?

13   A.   Well, I mean, there's -- see, these were historical records.

14   Pinging a phone is a completely different type of information

15   and, again, obtained through a search warrant.  And Find My

16   iPhone is typically done from a user using their iPhone to find

17   another iPhone or find another device that's emitting a

18   Bluetooth signal.

19   Q.   And, again, GPS typically is far more reliable and accurate

20   than historical cell locations; is that correct?

21   A.   It just depends on what kind of GPS you're talking about.

22   Like, it would -- it would be different to say -- or it would be

23   tough to say that it's more accurate.  I mean, are we talking

24   about military grade?  Are we -- GPS?  Are we talking about Find

25   My iPhone?  In my experience, I've had trouble with, "Hey, my

1   iPhone's here," and we go there and it's really not "there"
2   there.
3   Q.  Have you looked at any error rates between GPS location and
4   historical cell sites?
5   A.  None that I can think of right now, no.
6   Q.  Have you heard of triangulation?
7   A.  Yes, sir.
8   Q.  And that was not done here either; is that correct?
9   A.  Triangulation with -- these are -- I have taken the cell
10  phone records provided me by T-Mobile.  I've taken the cell site
11  that they were -- that they were -- the GPS was provided for,
12  and I just mapped that.
13  Q.  I want to switch gears just a little bit here.  I think you
14  said on Tuesday when you testified that you were a homicide
15  detective before coming into the forensic --
16  A.  Yes, sir.
17  Q.  -- whatever we call your -- the forensic unit?
18  A.  That's right.
19  Q.  As a homicide detective, would you respond to crime scenes?
20  A.  Yes.
21  Q.  And when you as the detective would arrive at these crime
22  scenes, would you call for assistance from the crime scene unit,
23  the CSU units?
24  A.   In most homicide related investigations we do.  I mean,
25  there are some, I'm sure, that don't, and those are -- but it's

1   very rare.

2   Q.  It would be typical to have somebody from the crime scene

3   unit to come in.  Would that be fair to say?

4   A.  It depends on -- yeah, if there was a murder scene, yes.  I

5   mean, typically we would have a CSU technician come; but, again,

6   the police department's split into different departments really,

7   and homicide is different than, robbery is different than, sex

8   crimes is different than criminal interdiction.

9   Q.  I mean, I'm not trying to be tricky here.  Again, CSU would

10  respond to a typical homicide crime scene; is that correct?

11  A.  To a homicide crime scene, yes, sir.

12  Q.  And they would come in at the direction of the detective,

13  would that be correct, or another officer?  Somebody invited

14  them to come.  Would that be correct?

15  A.  Yes, sir.

16  Q.  Okay.  And when they get there, the detective or some

17  officer would probably direct them to collect evidence.  Would

18  that be fair to say?

19  A.  Yes, sir.

20  Q.  Okay.  And part of the evidence that would be collected

21  would be items that may have DNA on it.  Would that be correct?

22  A.  Yes, sir.

23  Q.  And to swab items for DNA; correct?

24  A.  Yes, sir.

25  Q.  And the reason you would swab for DNA is because it's

1    extremely accurate in identifying who may have been at that

2    particular scene; correct?

3    A.   It depends.  I mean, in my experience, not all DNA is just

4    because you touch something you leave this voluminous amount of

5    DNA there that's able to be tested.

6         Detectives will do that and crime scene technicians will

7    swab for DNA because at the time we only have one shot to really

8    grab as much evidence as we can.  And then as time goes by, we

9    will weigh that evidence with the other evidence.  It isn't --

10   it's almost like an investigative myth that we get all this DNA,

11   we immediately send it off, and the next day we have it back.

12        Typically what happens is we collect DNA.  We may get some

13   if we know what -- where we're swabbing and what specifically

14   that we're swabbing.  We will send that off to the lab.  It may

15   or may not take two years to get back, and then by that time

16   there will be other evidence.  So it's -- you know, it's a part

17   of an evidence toolbox, those being call detail records, DNA,

18   interviews, video, stuff of that nature.

19   Q.   Finished?

20   A.   Yes, sir.

21   Q.   Okay.  If you don't check for DNA, you're not gonna find

22   DNA; is that correct?

23   A.   No, I guess if you don't swab it, you don't have it.

24   Q.   You come in and there's a whole bunch of blood, there's a

25   chance someone might test that blood.  Would that be correct?

1   A.   It depends.   In my experience -- I mean, as a homicide

2   detective, I mean, there was blood, but there was also victim's

3   blood.   And we knew, obviously, in a homicide investigation that

4   the victim was there.

5   Q.   What do you do if you find a bloody knife?

6   A.   Well, you weigh it with the rest of the evidence in the

7   scene.

8   Q.   What do you do if you find a firearm?

9   A.   Again, you weigh it with the rest of the evidence within the

10  scene.

11  Q.   What if you find a cigarette?

12  A.   Again, it's -- you weigh it with the rest of the evidence

13  that's in the scene.

14  Q.   What if you find a bottle of water?

15  A.   Again, you weigh it because the bottle of water that's --

16  may or may not be indicative based on video and interviews and

17  other information, just like cigarettes and firearms and all

18  this -- all the other information that -- that you weigh it

19  against the information that you have from the scene.

20  Q.   What if you find a soda pop can?

21  A.   Again, all that I just said.   You weigh it with the other

22  evidence.

23  Q.   What if you have a video of a suspect using a pen?   Would

24  that pen be collected typically?

25  A.   I was never a robbery detective.

O'Daniel - Redirect

1  Q.  Say you were a robbery detective.  I asked about if you see

2  a suspect using a pen and you're trying to identify the suspect,

3  would that be something important as a detective to collect?

4  A.  Yes, sir.

5  Q.  And you would collect it to look for perhaps DNA, may or may

6  not get it, but --

7  A.  Yes, sir.

8  Q.  And you may also try and find latent prints off that.  Would

9  that be fair to say?

10  A.  You could attempt to do both.  Prints are -- in my

11  experience, prints are somewhat finicky.  It's -- you aren't

12  gonna get prints off -- or as good of a print off of a car

13  window as you are the -- you know, a specific type of pen with a

14  rubber grip on it.

15  Q.  If you don't collect and test, you're not getting anything;

16  is that fair to say?

17  A.  Yes, sir.

18  Q.  Lamar Jackson misses 100 percent of the throws he never

19  makes; is that correct?

20  A.  Yes, sir.

21          MR. RENN:  Nothing further, Your Honor.

22                    REDIRECT EXAMINATION

23  BY MS. GOMEZ:

24  Q.  Detective O'Daniel, you've talked a lot about your

25  experience as a homicide detective and DNA and fingerprints, and

1   your experience with that as a homicide detective is pretty

2   extensive, is that -- would that be accurate to say, having to

3   do all those -- how many years were you a homicide detective?

4   A.   I was in homicide for five years.

5   Q.   Okay.  Five years.  Roughly how many cases would you be

6   working during that time?

7   A.   Hundreds.

8   Q.   Okay.  And as part of those cases are there sometimes

9   fingerprints involved?

10  A.   There are sometimes fingerprints involved.

11  Q.   Sometimes DNA?

12  A.   Sometimes there's DNA.

13  Q.   Okay.  And you indicated that you would weigh it against the

14  other evidence; is that correct?

15  A.   Yes, ma'am.

16  Q.   Okay.  Would you -- if you had, for example, a vehicle that

17  you knew was owned by a husband and wife, would you test for --

18  as a homicide detective, for example, if you responded to a

19  scene and you were interested in a vehicle and it was possessed

20  by a husband and wife and that was something that you knew,

21  would you look for DNA evidence to match the husband and wife?

22  A.   No.  It was a vehicle that was owned by the husband and

23  wife.

24  Q.   So would you test for DNA in something like that?

25  A.   No.

1  Q.  Would you fingerprint it to look if the husband and wife had

2  been in the vehicle?

3  A.  No.

4  Q.  Why not?

5  A.  Because you can prove their ownership -- because I assume

6  you can prove their ownership through other -- through other

7  means.

8  Q.  Okay.

9  A.  Again, it's -- it goes back to that toolbox.  There's other

10  things that we can do aside from DNA and fingerprints.

11  Q.  Okay.  DNA and fingerprints -- do you get a time stamp on

12  when someone's DNA is at the scene?  For example, if I touch

13  this at some point in time and you weren't in here, would you

14  know from the DNA or fingerprints when I touched this bottle of

15  hand sanitizer?

16  A.  No, ma'am.

17  Q.  Okay.  Would DNA and fingerprints give you what would be

18  called a lead?

19  A.  Yes.

20  Q.  Okay.  What does that mean?

21  A.  It's -- for example -- I don't know -- if someone murdered

22  you with that hand sanitizer and -- or -- well, if someone

23  murdered someone else with that hand sanitizer and your DNA was

24  on it, it would be an investigative lead that we would have to

25  corroborate before we went and followed through.  I mean, it was

1   just -- it would be something that we would follow up on.  Not

2   only would we do DNA, we'd also do -- I hate to keep using the

3   metaphor, but we would dig into the toolbox and find out what

4   our next investigative step would be.

5   Q.  Okay.  So if it was a room that was heavily traveled like

6   this courtroom and somebody was murdered in here and you found

7   my DNA in here, would that be -- would you be -- I take that

8   back, not DNA.  You found, for example, my fingerprints

9   somewhere in the courtroom.  Would that automatically mean that

10  I'm who did the murder in the courtroom?

11  A.  No, ma'am.

12  Q.  Okay.  So, again, you were talking about the toolkit.  Is

13  that just a lead?

14  A.  Yes, ma'am.

15  Q.  Okay.  And you were talking about, in terms of DNA, that it

16  takes a long time to get back.  Is it -- is everyone in the

17  United States in this DNA database to where you can submit DNA

18  and, bam, their DNA is in there?

19  A.  No, no.

20  Q.  Okay.  So in your experience as a law enforcement officer,

21  did you have times when you were a homicide detective that you

22  got back DNA but no hits on who it belonged to?

23  A.  Yes, yeah.  I mean, I've -- if it wasn't me personally, I

24  definitely heard of it happening where it comes back and it's

25  just a male DNA or a female DNA.

1    Q.   Okay.  You were asked about your educational background.

2    Can you tell the jury what type of educational background you've

3    received with regards to working with -- strike that.  You

4    indicated -- what is the name of your unit that you work with?

5    A.   The Digital Forensics Unit.

6    Q.   Okay.  The Digital Forensics Unit.  What type of training

7    have you received to do -- to look at the cell phone records?

8    A.   So they -- we use a lot of -- I don't know.  I'm trying

9    to --

10   Q.   You can just -- just tell me what training -- what courses

11   have you done?

12   A.   Oh, okay.  So I've taken a basic course in call detail

13   records analysis, a subject matter expert course in call detail

14   records.  Excuse me.  There's other tools that -- other forensic

15   tools that we use, and they provide training for cell phone

16   extractions and cell phone analysis.  There's other forensic

17   tools that we use that do other basic courses through cell phone

18   and call records analysis.

19   Q.   I forgot to ask you one thing.  When Mr. Renn was asking you

20   questions, you indicated that the DNA can take a long time to

21   come back, sometimes in your experience two years to get DNA

22   information once you submit it.

23   A.   Yes, ma'am, yes, ma'am.

24   Q.   What about fingerprints, does that come back faster or

25   slower than DNA?

O'Daniel - Recross

1  A.   In my experience, it comes back faster.

2  Q.   Do you sometimes get fingerprints that you're not able to

3  identify to a particular person when you do fingerprints on a

4  case?

5  A.   Yes.  It's my belief that -- I mean, it's -- just because

6  you leave a finger -- if you touch something where a lift can be

7  taken, it may be partial or it -- I don't know specifically how

8  they work, but --

9  Q.   But if you get a --

10            MR. RENN:  Objection, Your Honor.

11            THE COURT:  If you can rephrase your question that you

12  believe stays within his knowledge and the scope of the cross-

13  examination, please try.

14            MS. GOMEZ:  Yes, Your Honor.

15  BY MS. GOMEZ:

16  Q.   With regards to -- in your time as a homicide detective, did

17  you ever get a fingerprint that -- you were talking about the

18  quality could be different.  That's not -- I'm asking did you

19  ever get a fingerprint as a homicide detective that, again,

20  because they're not in the system you don't know who that

21  fingerprint belongs to?

22  A.   None that I can recall.  We just --

23            MS. GOMEZ:  Okay, okay.

24                         RECROSS-EXAMINATION

25  BY MR. RENN:

1   Q.  Are there a lot of unsolved murders in Louisville right now?

2   A.  Absolutely.

3   Q.  As far as the time of DNA, if you're gonna accuse somebody

4   of a crime, certainly a serious crime, is it worth getting it

5   right?

6   A.  Yes.

7   Q.  Regardless of the time?

8   A.  That is a -- that is a --

9   Q.  I would like a yes or no, and then you can explain it all

10  you want.

11  A.  I honestly don't know how to answer that.  I mean, yes, it's

12  worth getting it right, absolutely, but there's -- in my

13  experience, there's other routes to take -- sorry -- there's

14  other routes to take to get to getting it right.

15  Q.  Shortcuts are okay?

16  A.  No, sir.

17  Q.  If it's important to find out who was in a vehicle rather

18  than who owned a vehicle, would it be important to get that

19  right as a crime scene investigator?

20  A.  I'm sorry.

21  Q.  If it's important who was in the vehicle and perhaps driving

22  a vehicle --

23  A.  Yes, sir.

24  Q.  -- rather than who owned the vehicle, would it be important

25  to get that right?

O'Daniel - Recross

1    A.   Yes, sir.

2    Q.   And a way that you could do that would be through

3    fingerprints; correct?

4    A.   Yes, sir.

5    Q.   Or DNA; correct?

6    A.   Yes, sir, and there's other ways as well.

7    Q.   And if you don't test, you're not getting anything; is that

8    correct?

9    A.   If you don't test for the DNA?

10   Q.   If you don't test for DNA, you're not getting DNA; correct?

11   A.   No, sir, but if I can explain.

12   Q.   If you feel the need to, go right ahead.

13   A.   Yes, sir.  I mean, in this scenario, if you're -- if you're

14   trying to show ownership or someone was in the car, there's

15   other ways to do it besides just fingerprints and DNA.

16       We have cameras throughout the city that also provide this

17   information and also witness statements or pictures or there's

18   other digital means that also show that a -- that a person or

19   person's phone was also in a car during that time.  So those are

20   two routes, absolutely, but there's also other routes.

21   Q.   Have you ever had a witness lie to you?

22   A.   Yes, sir.

23   Q.   DNA doesn't lie, does it?

24   A.   Not in my -- not in my recollection, no, sir.

25   Q.   Fingerprints may be --

1    A.   Not my experience.

2    Q.   -- fingerprints may be subjective but not DNA; is that

3    correct?

4    A.   Yes.   They usually give you some sort of, like, one in

5    however many million or quadrillion or something like that.

6    Q.   Huge, huge number with a whole lot of zeroes; correct?

7    A.   Yes, sir.

8              MR. RENN:   Nothing further, Your Honor.

9              MS. GOMEZ:   Will the Court allow me to ask one

10   question?

11             THE COURT:   Uh-huh.

12                      FURTHER REDIRECT EXAMINATION

13   BY MS. GOMEZ:

14   Q.   Is one of the means to tell -- to know if somebody was in a

15   vehicle if they tell you they drove the vehicle?

16   A.   Yes.

17             THE COURT:   All right.   May we excuse O'Daniel?

18             MR. RENN:   Yes.

19             MS. GOMEZ:   Yes, Your Honor.

20             THE COURT:   All right.   Thank you, sir.

21             THE WITNESS:   Thank you, Judge.

22        (End of testimony.)

23        (Testimony concluded at 10:28 a.m.)

24

25

1                    C E R T I F I C A T E

2        I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

3   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

4

5
            s/Dena Legg                    November 25, 2022
6   Certified Court Reporter No. 20042A157    Date
    Official Court Reporter
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                                    INDEX

2     GOVERNMENT WITNESS:

3     DETECTIVE TIM O'DANIEL
           Direct Examination By Ms. Gomez (continued)      4
4          Cross-Examination By Mr. Renn                    17
           Redirect Examination By Ms. Gomez               29
5          Recross-Examination By Mr. Renn                  34
           Further Redirect Examination By Ms. Gomez        37
6

7                                   EXHIBITS

8     GOVERNMENT:

9     60                                                    6

10

11    DEFENDANT:
      No exhibits

12

13

14

15

16

17

18

19

20

21

22

23

24

25