```
 1                    UNITED STATES DISTRICT COURT
                      WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
      UNITED STATES OF AMERICA,      )    Case No. 3:21-CR-00089-BJB
 4                                   )
               Plaintiff,            )
 5                                   )
      v.                             )
 6                                   )
      SALVADOR ABDUL JONES           )
 7                                   )    October 4, 2022
               Defendant.            )    Louisville, Kentucky
 8
                             * * * * *
 9
                             VOLUME I
10        TRANSCRIPT OF TESTIMONY OF DETECTIVE TIM O'DANIEL
                         AT JURY TRIAL
11           BEFORE HONORABLE BENJAMIN J. BEATON
                  UNITED STATES DISTRICT JUDGE
12
                             * * * * *
13
      APPEARANCES:
14
      For United States:      Alicia P. Gomez
15                            Emily Lantz
                              U.S. Attorney's Office
16                            717 West Broadway
                              Louisville, KY  40202
17
      For Defendant:          Patrick J. Renn
18                            Smith & Helman
                              600 W Main Street, Suite 100
19                            Louisville, KY  40202

20    [Defendant present.]

21

22                      Rebecca S. Boyd, RMR, CRR
                          Official Court Reporter
23                        232 U.S. Courthouse
                          Louisville, KY 40202
24                          (502) 625-3777

25    Proceedings recorded by mechanical stenography, transcript
      produced by computer.
```

O'Daniel - Direct                                   Volume 1, Page 2

1          (Begin proceedings in open court at 2:34 p.m.   Jury

2      in.)

3              THE COURT:  All right.  Welcome back.  Ms. Gomez.

4              MS. GOMEZ:  Yes, Your Honor.  United States calls

5      Timothy O'Daniel.

6          (DETECTIVE TIM O'DANIEL, called by the Government, sworn.)

7                         DIRECT EXAMINATION

8      BY MS. GOMEZ:

9      Q.   Will you please introduce yourself to the jury by telling

10     them your name?

11     A.   Yeah.  I am Tim O'Daniel --

12     Q.   Okay.

13     A.   -- with the Louisville Metro Police Department.

14     Q.   Okay.  And you indicated you're employed by the Louisville

15     Metro Police Department.  How long have you been employed by

16     LMPD?

17     A.   Yes, ma'am.  I've been there approximately -- almost 12

18     years.

19     Q.   Okay.  And what -- where are you assigned?

20     A.   I'm currently assigned to the digital forensics unit.

21     Q.   Okay.  What is the digital forensics unit?

22     A.   So part of this, I was assigned to the homicide unit, and I

23     ran kind of a de facto digital forensic unit.  We were

24     established last year.  And what it is is we also -- we do -- we

25     do take physical cell phones, but we also do cell site analysis

O'Daniel - Direct                                         Volume 1, Page 3

1    using cell phone numbers.  We also will serve search warrants

2    and subpoenas to Facebook and social networking, Google and

3    Apple.

4    Q.   Okay.  And what is your title within the digital forensics

5    unit?

6    A.   I am a detective.

7    Q.   Okay.  And -- so in this case, did you receive some search

8    warrant returns on two cell phone numbers and process those?

9    A.   Yes, I did.

10   Q.   Okay.  Tell me, how do you do that?

11   A.   So what happens at the Louisville Metro Police Department is

12   a detective will draft a search warrant based on his

13   investigation, his or her investigation, and -- to an

14   appropriate company.

15       In this case, with a cell phone number, without having the

16   actual physical cell phone, we can actually get subscriber

17   information, location information, and kind of like a beefed-up

18   version of your cell phone records but with location

19   information.

20       That's all applied for in a search warrant.  The detective

21   will bring it to the Court.  The Court will allow it, and then

22   someone from LMPD will serve either T-Mobile, Verizon or AT&T

23   with a search warrant, and the search warrant will be

24   provided -- or the returns will be provided to LMPD.

25   Q.   By returns, what do you mean by that?

1  A.  If I could -- if I could use my -- I actually made a

2  PowerPoint, but if I could use -- so there is a -- so when they

3  serve LM -- or when LMPD serves T-Mobile, for example, in this

4  case, they will give -- or return a giant Excel spreadsheet,

5  basically, and it will have incoming and outcoming calls, the

6  date and time of the incoming and outcoming calls, location

7  information, and also the duration of the call and the cell site

8  that the device was using.

9  Q.  Can I show you -- I'd like to show you Government's Exhibit

10 40A and 40B, and tell me if you recognize what these are.  This

11 is 40A.

12 A.  Yes.

13 Q.  Do you recognize what that is?

14 A.  Yes.

15 Q.  Okay.  And 40B.

16 A.  Yes.

17 Q.  You recognize that?  Okay.  What is in those exhibits that

18 we've just -- before I show them to the jury.

19 A.  Okay.  So -- yeah.  So these are the actual returns, what I

20 was talking about.  So the detective has served, for example, in

21 this case, T-Mobile with the search warrant, and T-Mobile has a

22 massive legal department.  Well, a good-sized legal department

23 where they will process hundreds and thousands of these types of

24 search warrants every year.

25     They provide back a standard report from -- from their

1    network, and that's what this is.  This is -- this is the actual

2    return of the search warrant or the things that were asked for

3    in the search warrant.

4    Q.  Okay.  Are the things on the screen, Government's Exhibits

5    40A and 40B, these documents that we're seeing, do they fairly

6    and accurately depict what was the search warrant returns in

7    this case?

8    A.  Yes, ma'am.

9            MS. GOMEZ:  Okay.  I would move to introduce

10   Government's Exhibits 40A and 40B.

11           MR. RENN:  Objection.  No foundation, Your Honor.

12           THE COURT:  Go to headphones, please.

13       (Bench conference on the record.)

14           THE COURT:  What else do you think he should have

15   testified to?

16           MR. RENN:  Your Honor, according to the information on

17   40A, it shows that the requester of the information was Thomas

18   Hod -- Hodgkins, and I guess he is the one that received these

19   records pursuant to a search warrant.

20       Again, there's no -- been foundation that the warrant was

21   executed, who executed the warrant, who received these records.

22   All we know is he ultimately received these.

23           THE COURT:  All right.  Ms. Gomez, do you think you

24   could ask him if he could explain how these records came to be,

25   and why he understands what they say?

1          MS. GOMEZ:  I can absolutely do that, Judge.

2          THE COURT:  Okay.  Anything else you anticipate taking

3    objection with?

4          MR. RENN:  There is going to be an issue with this

5    witness, I believe, and it's going to be a Bullcoming problem.

6      This witness is ultimately going to be talking about cell

7    tower and pinging of a cell tower.  When I reviewed this in

8    anticipation of this case, there is an e-mail to this particular

9    witness, and it's from a company ZetX TRAX.  It appears they're

10   the ones that did the mapping here, not this witness.  So under

11   Bullcoming, it would be improper for this witness to talk about

12   what someone else did.

13         MS. GOMEZ:  Judge, I don't expect that that's going to

14   be the case.  He prepared the PowerPoint presentation.  He's

15   going to be showing the jury explaining the cell phone mapping

16   and the pings.

17         THE COURT:  And is he going to explain why it is he

18   knows the information he's talking about?

19         MS. GOMEZ:  Yes, Your Honor.

20         THE COURT:  Okay.  All right.  Well, if you have a

21   specific objection later, you can take it up, but for now, let's

22   just ask questions that demonstrate why he's competent to

23   discuss these records, and we'll go from there.

24      (End of bench conference.)

25   BY MS. GOMEZ:

1   Q.  Detective O'Daniel, before we go into the records.  How do

2   you -- how did you receive the records in this case?

3   A.  I was given these records by the lead detective, Detective

4   Dean.

5   Q.  Okay.  And, to your knowledge, are they the records that

6   were received pursuant to a search warrant?

7   A.  Yes.

8           MS. GOMEZ:  Your Honor, I would move to introduce

9   Government's Exhibits 40A and 40B.

10          MR. RENN:  Same objection, Your Honor.

11          THE COURT:  Sir, I guess, what's -- could you just

12  explain, if it's easy, what's the relationship between Dean, who

13  you mentioned, and Hodgkins, whose name is on the records?

14  A.  Yes, sir.  So at the time, there was a -- there was a unit

15  that would just send this stuff off, and it was really just for

16  billing information.  Because these records cost money, every

17  time that we send one in.

18      When we received it back, I guess I would assume that

19  Hodgkins sent it to Dean, and then Dean would send it -- Dean

20  sent it to me.

21  BY MS. GOMEZ:

22  Q.  Okay.

23  A.  So that's how I came to be involved in the historical part

24  of these -- of the search warrant.

25  Q.  Is Thomas Hodgkins an individual employed by LMPD?

1   A.  He is, yes.

2   Q.  Okay.  Is he generally who received the records?

3   A.  Him or someone in that unit, yes.

4   Q.  Okay.  And then is it common practice that they be provided

5   to the detective who got the search warrant signed for the

6   records?

7   A.  To -- yes.  To the best of my ability, yeah.  I mean, that's

8   from -- they would -- would receive it, and then they would send

9   it out to whoever the lead investigator is on that -- on that

10  case or who initiated the search warrant or wrote the search

11  warrant.

12  Q.  Are these cert -- were those records certified?

13  A.  One -- one -- I don't -- I don't recall if the -- if the

14  T-Mobile ones were or not.

15  Q.  Okay.  But they were received pursuant to a search warrant?

16  A.  Yes.

17          MS. GOMEZ:  Okay.  Your Honor, I would move to

18  introduce Government's Exhibit 40A and 40B.

19          MR. RENN:  Same objection.

20          THE COURT:  Okay.  I'll overrule the objection and

21  allow these in, but I think you should really tailor your

22  questions to what -- his role in this, and how he knows what

23  he's testifying to.  Okay?

24          MS. GOMEZ:  Yes, Your Honor.

25          (Government Exhibits 40A and 40B admitted in

1    evidence.)

2    BY MS. GOMEZ:

3    Q.   Okay.  So you received these records.  Explain what it is

4    that you get out of these records.

5    A.   So if your -- or these -- if you --

6    Q.   And, actually, I'm sorry.  Let me take that back.  Before we

7    go into that.

8    A.   Yes.

9    Q.   How many records would you say you have reviewed in the

10   past?

11   A.   Oh.  I've been doing this job since around 2018, so

12   thousands.

13   Q.   Okay.  And what do you normally do with the records?

14   A.   So now what happens is the detective -- and in this case,

15   the detective will send me the records.  I take the records and

16   ingest them into a software that we use is -- and if we're -- if

17   you're looking at these records, and if you go a little farther

18   off to the -- to the right, it will have cell site information,

19   and this software reads the actual cell site location, and,

20   basically, these records are your -- your device's interactions

21   with those cell sites.

22   Q.   Okay.  And you indicated that you put -- you, essentially,

23   put these records inside of a software; is that correct?

24   A.   Yes.

25   Q.   Okay.  Are you trained in using that software?

O'Daniel - Direct

1  A.  I am.  Yeah.  So I've taken a 40-hour basic course, a

2  40-hour subject matter expert course through the company that we

3  use to -- to provide this information.  Not only that.  I've

4  done forensic examinations of cell site analysis and other --

5  other law enforcement investigative courses used for cell site

6  analysis.

7  Q.  Okay.  How many times would you say you have used this

8  software by putting in cell phone records into it and ingesting,

9  essentially, the PowerPoint-type product you are going to be

10  showing the jury?

11  A.  Hundreds of times.

12      MS. GOMEZ:  I would like to publish Government's

13  Exhibit Number 40A.

14      THE COURT:  Okay.

15  BY MS. GOMEZ:

16  Q.  Okay.  If you could explain to the jury what they are

17  looking at here.  You talked a little bit about the records, but

18  if you could explain what they're looking at.

19  A.  So this is the response from T-Mobile.  Obviously, the top

20  is self-explanatory.  These were the -- the information was

21  provided on May 20, 20 -- 2021, in response to a search warrant

22  for the target number, which is that, if I can -- I think I can

23  do this.

24  Q.  Yes.

25  A.  You see the (615) 351-3671.  This was the -- the number the

1   search warrant -- or I believe that the search warrant was

2   written for, and those -- and if you keep on going down to the

3   next sentence.

4        T-Mobile provides these records in a date that they receive

5   it but also what they call Universal Coordinated -- or Universal

6   Time Coordinated or Coordinated Universal Time, which is

7   otherwise known as Prime Meridian Time, Greenwich Mean Time.  In

8   the -- in the military, we called it Zulu time.

9        It's just -- it's a standard that a lot of companies use so

10  that they don't have to adjust for the difference between

11  Louisville Metro Police Department and, for example, Paducah

12  Police Department, because we're on two different time zones.

13  So they provide these records back in the standard time zone.

14  And if I can delete that.

15  Q.  And we can see here on this page that this is one of one

16  thousand four hundred eighty-five; is that correct?

17  A.  Yes.

18  Q.  So are -- these records, you had indicated, generally, when

19  received back, are pretty voluminous?

20  A.  They are -- yeah.  They are very large.

21  Q.  Okay.  So you indicated that you received the records for

22  this phone number here, the (615) 351-3671; is that correct?

23  A.  Yes.

24  Q.  Okay.  And what did you do once you received these records

25  in this case?

1    A.   So, again, I take this -- this is provided in an Excel-type

2    format, and I take them and I ingest them into our software, and

3    our software will spit out what's a -- what is a KMZ or it's

4    a -- it's a ZIP file of a Google Earth mapped location, and --

5    yeah.

6    Q.   And did you prepare a presentation today of the records --

7    using those records provided by T-Mobile?

8    A.   Yes, ma'am.

9    Q.   Okay.  And just to be clear.  Was this a presentation you

10   created yourself?

11   A.   Yes.

12   Q.   Okay.  Using the software that you've been trained on?

13   A.   Yes.

14         MS. GOMEZ:  Okay.  Your Honor, I would move --

15   BY MS. GOMEZ:

16   Q.   And the information that's in the records -- or in this

17   presentation, does it fairly and accurately depict what you did

18   with these records?

19   A.   Yes.

20         MS. GOMEZ:  Your Honor, I would move to introduce

21   Government's Exhibit 41 and allow the wit -- publish -- allow

22   for it to be published, and for the witness to be able to show

23   it to the jury.

24         MR. RENN:  Same objection, Your Honor.

25         THE COURT:  Can you give Mr. Renn and me copies of

1   this presentation?

2        MS. GOMEZ:  I have provided -- I have provided it

3   prior.

4        THE COURT:  So it's in my binder?

5        MS. GOMEZ:  Yes, Your Honor.  And I provided a zip --

6   a thumb drive as well with the entirety of the records and the

7   presentation.  And slide number five, Your Honor, is

8   interactive, so it can only really be viewed on the thumb drive.

9        THE COURT:  Can we go to headphones, please?

10      (Bench conference on the record.)

11       THE COURT:  All right.  So looking at 41.  First slide

12  is just excerpts of what we've -- the type of record that

13  we've -- that I admitted and we've been discussing, right?

14       MS. GOMEZ:  That's correct, Your Honor.

15       THE COURT:  Okay.  What's the next slide?

16       MS. GOMEZ:  The next slide is just -- it's just

17  photographs so the jury can understand that cell sites are

18  essentially everywhere.  They're essentially hidden in the city

19  without us knowing they are placed at different locations.  It's

20  just an example of where cell sites are located.

21       THE COURT:  All right.  Mr. Renn, do you have any

22  objection to this slide?  I mean, I'm assuming if you ask him

23  about it, you're going to make clear that these aren't

24  necessarily the cell sites he's talking about, right?  These are

25  purely --

 1              MS. GOMEZ:  Examples.

 2              THE COURT:  -- examples?

 3              MS. GOMEZ:  That's correct, Your Honor.

 4              MR. RENN:  I understand, Your Honor.  Yes.  Thank you.

 5              THE COURT:  That's fine?

 6              MR. RENN:  Yes.

 7              THE COURT:  All right.  Next slide.  What do we have

 8  here?

 9              MS. GOMEZ:  This is what the returns look like for

10  them once he puts it in the software, Your Honor.

11              THE COURT:  Tell me in plain English what the software

12  does.

13              MS. GOMEZ:  Essentially, when they are -- when they

14  get back the cell phone location information, the tower is set

15  up, not like a triangle, but it's sort of like a slanted T.  And

16  so it's split up into three quadrants, and so you can tell which

17  face of the tower the phone is using.

18      And so when they receive the records, this has the phone

19  number that was connected to, they can tell -- it says outgoing

20  voice, so they can tell from the records that it was a phone

21  call that was made to this number.  The duration would be 12

22  minutes.

23      With the tower that was used in the sector, that's how the

24  software is able to -- that's how the detective is able to look

25  at the -- from the software and know that it's correct, and he

O'Daniel - Direct

1    has actually -- he knows from doing this multiple times exactly

2    how it -- for example, in this case, there is a cell tower

3    directly outside of the defendant's house.

4        And so he has driven to some of the cell towers, not all of

5    them, and can know, essentially, the way the cell tower provides

6    that information.  And then it tells you --

7            THE COURT:  Hold on.  He ran the data he got for a

8    warrant through a program which produced an image like the one

9    on the left of this sheet?

10           MS. GOMEZ:  That's correct.

11           THE COURT:  And he then recreated or corroborated or

12   what did he do in person?

13           MS. GOMEZ:  He does what's called a drive test, not to

14   every cell site, but that he goes to see if there is a cell site

15   close by.

16           THE COURT:  Close by what?

17           MS. GOMEZ:  Close to -- so the records are

18   indicating -- well, this -- this black dot on the -- on the

19   fourth slide is where the cell site is located.

20       So he wants to make sure that, obviously, it's accurate.  So

21   that's why he looks at, okay, there is a cell site in this area.

22   But it provides, essentially, this radius, it's quite a big

23   radius, in terms of the -- what is provided.

24           THE COURT:  So his testimony is that when he -- when

25   these two numbers connected on this twelve-second call, this was

1    the area in which the target number would have been located?

2           MS. GOMEZ:  That's correct.  It's using that tower to

3    place the call.

4           THE COURT:  Okay.  Why can't he explain it in plain

5    English like we're talking about it now?  If this is his job,

6    and he does it all the time, we're really not doing a great job

7    of connecting his knowledge to the facts he was given, and to

8    explain why he knows what he knows.  I'm not doubting that he

9    can, but I just think it's been quite confusing --

10          MS. GOMEZ:  I think he's --

11          THE COURT:  -- thus far.

12          MS. GOMEZ:  -- used to using his PowerPoint to explain

13   it, Judge, and so I think that's what he's struggling with is

14   that, normally, he uses his PowerPoint to explain this.

15          THE COURT:  Isn't this his PowerPoint?

16          MS. GOMEZ:  This is.

17          THE COURT:  All right.  So, Mr. Renn, I think on this

18   cell site analysis tab, I don't know if you have a specific

19   objection here, but to the extent he is able to say, you know,

20   "Here is the information we received.  This is the depiction of

21   what I know to be true on the ground, and this is what I,

22   through this typical method, sort of derive from it, and that's

23   what I'm showing here," then that seems to be all right.

24      I don't want him to get up there and just say, "Oh, we know,

25   because here's what the program, you know, spits out, and take

O'Daniel - Direct

1    my word for it," you know, but I don't think we're going to -- I

2    don't think we're headed there.  So in light of what I said and

3    what she said, do you have a concern about this particular

4    slide?

5              MR. RENN:  Your Honor, I'm not sure about the slide,

6    but, again, I've got an e-mail that was sent from the company,

7    it's a LexisNexis company, ZetX TRAX, and it says, "Hello,

8    Timothy O'Daniel.  TRAX was able to map the file CDR

9    mediations," and that's what T-Mobile calls their data records,

10   and it has the number.  You can view this on Google Earth map

11   here, and then you go to the download.

12       So this is clearly saying that TRAX did it, and he may say

13   he put it into the software, be he's being advised by the

14   company that they're the ones that was able to map this out.

15       And then they say some of the rows from the file cannot be

16   mapped.  "In order to fully map the cell sites and rows listed

17   below, we'll need more information from T-Mobile.  You can

18   discard this e-mail if you do not need the rows listed below and

19   mapped."

20       So, again, based on this e-mail, it seems very plain someone

21   other than this witness did this PowerPoint or, you know, mapped

22   these -- mapped this information out.

23             THE COURT:  And even if someone else was involved in

24   the creation of this image, if it represents what he knows and

25   methods he can understand and apply, then what would the problem

O'Daniel - Direct

1    be?

2              MR. RENN:  Your Honor, and go --

3              THE COURT:  Not just that someone else put it

4    together, right?  What's the missing information?

5              MR. RENN:  No.  It's Bullcoming, Your Honor.

6              THE COURT:  How does the holding of Bullcoming limit

7    his ability to present information that -- that he knows and

8    understands?

9              MR. RENN:  In Bullcoming, Your Honor, they sent a lab

10   personnel who actually did not do the testing in to testify, and

11   the United States Supreme Court said that's not -- that's not

12   accurate.  That's not enough.  You have to have the person that

13   actually did the testing.

14       And here, it sure looks like to me that this LexisNexis

15   company was the one that was able to map these CDR mediations,

16   again, the call detail records from T-Mobile.  They're sending

17   this e-mail to this witness saying, "We were able to map it."

18             THE COURT:  All right.  Ms. Gomez, I'm confident this

19   isn't the first time this has arisen.  How do you normally --

20             MS. GOMEZ:  Judge --

21             THE COURT:  -- overcome an objection that, you know,

22   the witness on the stand isn't the one who actually computed all

23   of this?

24             MS. GOMEZ:  Judge, but he said he is who did it.

25   That's why I don't -- I don't --

1          THE COURT:  So what's your answer to this objection

2     that Renn is raising about LexisNexis having done it?  What's

3     the difference here?

4          MS. GOMEZ:  I mean, I think he can cross him on that.

5     You're saying that you made it --

6          THE COURT:  No, but --

7          MS. GOMEZ: -- or not, but it says that he made -- he

8     made the --

9          THE COURT:  It can't be true that both he did it and

10    Lexis did it, and, surely, that it's something complimentary,

11    right?  Not the exact same day.

12         MS. GOMEZ:  I have that Detective Dean gave him the

13    raw data, and that he created this PowerPoint.  So, I mean --

14         THE COURT:  So what's this Lexis thing he's talking

15    about?  Do you know?

16         MS. GOMEZ:  Honestly, I provided the e-mails in

17    Jencks, but I don't -- I don't even know -- I didn't pay that

18    much attention to it, Judge.  I provided the e-mails, but I

19    don't know even what he's talking about.

20       And I didn't realize he was citing a case when he was saying

21    Bull something or other, I thought he was using a slang term, so

22    I apologize.  I didn't realize he was citing a case when he --

23         THE COURT:  Okay.  The US Supreme Court decision about

24    the confrontation clause and DNA analysis.

25         MS. GOMEZ:  To the extent that a different map was

1    cre -- I don't -- I don't have that, Judge.  I don't -- I'm not

2    moving to introduce something somebody else made.  My

3    understanding is Detective O'Daniel used the raw data and made

4    this, Judge.

5              MR. RENN:  But from the software provided by

6    LexisNexis.

7              MS. GOMEZ:  From the software he is trained to use.  I

8    don't --

9              THE COURT:  Hold on.  If he used this software,

10   whether it's from Lexis or -- so it's TRAX?  That's what --

11   you're talking what we see here on the fourth slide?

12             MR. RENN:  That is correct.  Z-E-T, capital X, and

13   then TRAX, T-R-A-X.

14             THE COURT:  Okay.  If he used this tool to create this

15   map, then there's no Bullcoming problem, because you can

16   cross-examine him on how he used the data to produce this map or

17   these results, right?

18             MR. RENN:  Again, all I -- I'm not sure what he did,

19   but all I can say is this e-mail said TRAX was able to map, and

20   it gives the number --

21             THE COURT:  Right.

22             MR. RENN:  -- and the cell tower.

23             THE COURT:  Look, if he didn't do any of the analysis,

24   then we may have a problem, but she believes he did.  In which

25   case, you can cross him on it.

O'Daniel - Direct

1      So let's use this PowerPoint, and, again, let's stick to
2  sort of what he knows and what he did, not from -- not what he
3  heard from someone else, and then you'll have a chance to cross
4  him on it, and I think we'll be okay.  All right?
5      But let's just make very clear, clearer, hopefully, than he
6  has so far, what his role in using this information to create
7  this presentation is.  Okay?
8          MS. GOMEZ:  Thank you, Your Honor.
9          THE COURT:  All right.
10     (End of bench conference.)
11  BY MS. GOMEZ:
12  Q.  Detective O'Daniel, this software -- and just so we're
13  clear, did you use the software to create what -- the PowerPoint
14  we're about to see?
15  A.  Yes.
16  Q.  Okay.  And what's the name of the software you use?
17  A.  So it's a product by LexisNexis, it's called TRAX, and what
18  it is is you take the actual -- the search warrant return, which
19  is that Excel file like I was talking about, and you put it into
20  the TRAX.
21     And what it does is it helps you map but also analyze
22  those -- those records.  It converts the records that were
23  provided in that -- that Universal Time Coordinated into Eastern
24  Time, depending on the time of year.  And in this case, I think
25  it was UTC -- we were UTC minus four.

O'Daniel - Direct

1    But -- but it also -- it will provide what they -- what they

2    have as a cell site, an estimated location for the -- for a

3    device using -- with -- with what it's -- with the cell site

4    that it's interacting with.  Yes.

5    Q.  Okay.  And, again, just to be clear, you used the records

6    you received from the search warrant return to input them into

7    this software to get this presentation we're going to see?

8    A.  Yes.  I was provided those records by Dean.  Yes.

9    Q.  Okay.  And you made this presentation?

10    A.  Yes.  Yes, I did.  Yeah.

11        MS. GOMEZ:  Your Honor, I would move to introduce and

12    publish Government's Exhibit 41.

13        MR. RENN:  Objection for the same reasons previously

14    stated.

15        THE COURT:  Okay.  Let's admit this, but let's move

16    through it methodically.  Okay?

17        MS. GOMEZ:  Okay.

18        MS. ALIC:  We're frozen.  Just a second.  There we go.

19    BY MS. GOMEZ:

20    Q.  Okay.  All right.  What are we looking at here?

21    A.  So these are just -- I took a snippet of -- this is the

22    actual search warrant return, and there was -- this is a long --

23    the long form of what we just saw earlier.

24    This is, again, what we get back.  This is provided on May

25    20, 2021.  And if you go down, if you start from the left and go

1    right, it will be the date that a communication was made with

2    the target cell phone.  And, again, the -- or the cell phone

3    number.

4         So the target cell phone number was this (615) 351-3671.

5    The records were provided in UTC, and this is the date of this

6    call or text message, this is the date of -- or this -- I'm

7    sorry.  This is the time of that.

8         And, again, this is in -- excuse me.  That -- that U -- that

9    UTC time.  So to get to Eastern Time, you will -- typically,

10   what we do is we subtract four or five hours, and, in this case,

11   we subtracted four hours.

12        The -- if you would take this -- this line as an example,

13   this call was made on the 1st of April, 2021, at approximately

14   0105 and 29 seconds, and the time is in a 24-hour format similar

15   to military time.

16        There is -- the duration of the call was 19 seconds.  The

17   call type was mobile.  Terminating, which is the device or the

18   phone number that we're -- that we're looking at received an

19   incoming call from that (615) 947-5291.

20   Q.  Sorry.

21   A.  Oh, yeah.

22   Q.  I'm trying to help you.  Are you talking about this --

23   A.  Yes.

24   Q.  -- part in the record?

25   A.  Yeah.  Right.

1   Q.   Okay.

2   A.   So you can see that it received or it was -- it received an

3   incoming call from that number to our target number for 19

4   seconds.  And if you go just further on, this is the -- just to

5   explain these records.

6       This is the IMSI, which is the international mobile

7   subscriber identity, and, really, this is just a number for the

8   subscriber.  If you were to change phone numbers, this number

9   would stay the same.

10  Q.   Where -- where was that number on there?

11  A.   I'm sorry.  It's -- it's right here on the --

12  Q.   Okay.

13  A.   This is what we would call the IMSI.

14  Q.   Okay.

15  A.   And that's the actual subscriber number, and if I can,

16  like --

17  Q.   I'll delete it.

18  A.   There you go.  The IMEI is the actual -- for lack of a

19  better term, it's the serial number for the phone that -- that

20  we -- that was requested.

21      So the detective will request a search warrant on the phone

22  number and then get all this information back, the IMSI, the

23  IMEI, which is the actual type of phone, and he can look up --

24  or he or she can look up the actual type of phone.

25      And then if we get -- if you move a little further down, we

1    start talking about the actual cell site ID, the sector of the

2    cell site, and the latitude -- longitude and latitude of cell

3    site.  And this is where the software derives its location

4    information from.  So if I can go -- well --

5    Q.  Want to go forward?

6    A.  So -- yeah.  Can I?

7    Q.  Okay.

8    A.  Yeah.  If I can go forward, I can -- and clear it.

9    Q.  Go one more?

10   A.  No.  That's -- that's fine.

11   Q.  Okay.

12   A.  That's fine where --

13   Q.  Okay.

14   A.  Just -- just right there.  So when you -- when your phone or

15   your mobile device receives or makes an outgoing phone call or a

16   text message or data, it connects to what's generally known as a

17   cell site.  Some people call it a cell tower, and this is the

18   old school kind of cell tower where these -- there's these

19   giant, massive things, these giant, massive towers with -- with

20   all these radio antennas on it, but, really, a cell site could

21   be the side of a building, a street post and another street

22   post, and --

23   Q.  And just so we're clear, these are just examples, these

24   aren't the cell sites in this case; is that --

25   A.  Yes, ma'am.

O'Daniel - Direct

1    Q.   -- correct?

2    A.   Yeah.   These are -- these are pure examples of something

3    that I've observed, and then it makes it easier to explain how a

4    cell phone connects to a cell site.

5        So when you -- for example, when you make a phone call, your

6    cell site -- your cell phone interacts with that cell fight --

7    cell site.   And these cell sites, years ago, used to be these

8    giant towers.   Well, now, they're virtually everywhere.   They're

9    on -- are on the side of buildings.   They're on the street

10   posts.

11       And as cell phones become more common, and more data is

12   shuffled through cell phones, and all this information is

13   provided, they need more towers or they need more cell sites to

14   provide this information.

15       And so what happens is if you make a phone call -- let's say

16   you're in Shepherdsville, and you're coming to the federal

17   courthouse.   When you make a phone call, your phone is not going

18   to reach out to the cell site closest to the federal courthouse,

19   it's going to reach out to the cell site that it is closest to

20   you, maybe.

21       And it may -- it may reach out -- depending on geography and

22   weather, but it may reach out to a cell site in Shepherdsville,

23   and then you will -- as you're -- as you're driving in, you will

24   make handoffs.

25       And the same thing goes with receiving a phone call.   When

1    someone calls you, it goes to the site that's -- that's somewhat

2    closest to them.  It goes through T-Mobile's network, for

3    example, and they find you on wherever you're at, and then they

4    send you the phone call, and it happens very, very, very

5    quickly.

6        And that's what we're looking at when we see -- excuse me.

7    This information is that T-Mobile is saying that it used this

8    cell site at this location, and this is the address of the -- of

9    the cell site.  And so that's what LexisNexis, the TRAX

10   software, will use to derive that location information.

11           THE COURT:  So may I ask?

12   A.  Yes, Your Honor.

13           THE COURT:  The site ID is just a label for the tower,

14   right?

15   A.  Yes.  Yes, Your Honor.

16           THE COURT:  The first thing you circled?

17   A.  Yes.

18           THE COURT:  The second thing you've circled, those two

19   columns --

20   A.  Is --

21           THE COURT:  -- first tower lat and long, that is some

22   sort of locational designation, like -- like latitude and

23   longitude or something like that --

24   A.  Yes.

25           THE COURT:  -- but they're on a map, right?

O'Daniel - Direct

1    A.   Yes, Your Honor.

2              THE COURT:   And then the first tower address is the

3    street address where that numbered tower is found --

4    A.   Yes, Your --

5              THE COURT:   -- right?

6    A.   Yes, Your Honor.

7              THE COURT:   And so how is that phone call

8    associated -- how do you know that phone call is associated with

9    that tower site?

10   A.   Through the T-Mobile records.  So T-Mobile is saying that

11   this -- this phone call was used as the cell site ID.  That was

12   25778.  I will take these records, ingest them into the

13   LexisNexis software, and then to corroborate this -- this

14   information, I will use -- the Department of Justice has a --

15   actually, it has a website that you go to to look up these cell

16   sites to see the sectors and to see the actual location

17   information for them.

18             THE COURT:   All right.  I don't want to highjack this,

19   but can you just walk through his role in sorting this out, and

20   what you may or may not know from it?

21             MS. GOMEZ:   Yes.

22   BY MS. GOMEZ:

23   Q.   So tell us, when you're looking at this, exactly as the

24   Court just said, you get -- we saw that the cell phone records

25   really were over 1,000 pages; is that correct?

1    A.   Yes.

2    Q.   And then you put that in the software, and does the software

3    use -- you indicated that this is the cell site tower; is that

4    correct?

5    A.   Yes.

6    Q.   And then that these are the latitude and longitude

7    coordinates for where that tower is?

8    A.   Yes.

9    Q.   And then this right here, this physical address there is

10   actually where the cell tower is located?

11   A.   Yes.   That's the address --

12   Q.   Okay.

13   A.   -- of the cell tower.

14   Q.   And you can look that up on a website, you indicated, to

15   verify that that's where the tower is located?

16   A.   Yes.

17   Q.   And you could also drive there; is that correct?

18   A.   Yes.

19   Q.   Okay.  And so when you receive these records that has --

20   that have this information, the date, the duration of the call,

21   the phone number that made the call or received it, and the

22   towers, what do you then do with that information?

23   A.   So I take the information and I ingest it into the software.

24   Q.   Okay.  And we have another portion here at the bottom.  What

25   is that that we're looking at?

O'Daniel - Direct

1    A.  So -- so this is one -- one part of the actual search

2    warrant return was the actual -- the -- what they call -- the

3    call detail records.  This other part down at the bottom is the

4    subscriber information provided by T-Mobile.

5        And in this case, you can see that, you know, the subscriber

6    name, which can be whatever the subscriber either signed up for,

7    who is on the account, the account details, which, typically,

8    will provide someone's name, and the account number, the account

9    effective date, the type of phone.  So if you see the account

10   name and number and effective date the account -- or the actual

11   phone model, which is -- in this case, was the Apple iPhone SE2.

12       The ICCID is the SIM card serial number.  The IMSI, again,

13   is the subscriber information.  The MSISDN is, essentially, the

14   phone number, and then the device information is the IMEI.

15   Q.  Okay.  So you indicated -- once you put it in, what does the

16   product -- what does it look like once you put in this -- these

17   records for the system to process, the software to process?

18   A.  Yeah.  So I'll take these records.  Again, I'll ingest them

19   into this software.  The software will produce a Google Earth

20   file.  And what we do is we -- we will take the Google Earth

21   file, and then we'll analyze the location data from the actual

22   Google Earth file using -- using this -- these -- these -- the

23   product of LexisNexis.

24   Q.  Okay.  And does the Goo --

25            THE COURT:  Well, hold on.  What's a Google Earth

O'Daniel - Direct

1    file?

2    A.  It's a -- it's a KM -- it's a KML file.  Sorry.  It's a KML

3    file.

4               THE COURT:  What's a KML file?

5    A.  So it's -- it is -- it uses Google Earth Pro, and what you

6    can see is --

7    BY MS. GOMEZ:

8    Q.  What is Google Earth Pro?

9    A.  Google Earth Pro is a program -- to the best of my

10   knowledge, is a program put on by Google, and you can see

11   satellite images and street-level views of specific addresses,

12   states, and, in this case -- or, typically, what I work with is

13   Louisville and the surrounding areas.

14              THE COURT:  Is it just a map or is it spitting out

15   places on the map?  Does that make sense?  Are you taking data

16   and just putting it in a map or is it telling you -- is it

17   processing information?

18   A.  So it's -- it is spitting out the map as the base layer, and

19   then this -- this information from T-Mobile will be layered on

20   top of that using the location information.

21       So -- and it is a -- it is a point where -- like, the way I

22   believe that TRAX works is they -- they take this location

23   information, it plots it, and then it goes on the specific

24   sector of the cell site, and then --

25              MR. RENN:  And I'm going to object to all this.

O'Daniel - Direct

 1              THE COURT:  All right.  Let's go back to headphones.

 2       (Bench conference on the record.)

 3              THE COURT:  Are you going to ask this guy anything

 4       else besides the TRAX program?

 5              MS. GOMEZ:  Judge, I just want him to be able to play

 6       the cell -- the physical cell phone pings he got here and show

 7       where they showed.

 8              THE COURT:  What do you mean play it?

 9              MS. GOMEZ:  It's a PowerPoint that will show the

10       different location pings.

11              THE COURT:  I think we should press pause and let this

12       guy -- I mean, I would -- if you want to cross him now, you can,

13       but I would rather just pause, and then when it's time for a

14       break, have this guy take the stand, and we can just talk in

15       plain English outside the earshot of the jury about what he

16       knows and what he doesn't know.

17          But some of this is very hazy, and I don't think I'm in a

18       position yet to rule one way or another on the admissibility or

19       objections without hearing, in more detail, what he knows and

20       what he doesn't know, and how this all operates.

21          And -- and then I don't know where -- we could take a break

22       and do that now or we could just move -- move on and come back

23       to him.  We've been going, I don't know, only about 35 minutes

24       or so, but I just -- I don't think I'm in a position right now

25       to give you a thumbs up or thumbs down on this, and I'm nervous

1   about exploring it in front of the jury.

2           MS. GOMEZ:  Judge --

3           THE COURT:  And I think Mr. Renn is wor -- has the

4   same concern.

5           MS. GOMEZ:  I would ask that we take a break.

6   Detective O'Daniel is out of town, so I have to -- it's kind of

7   an odd time to put him on.  Obviously, he's out of order, but he

8   is going out of town, which is why I had to put him on today.

9           MR. RENN:  Your Honor, I would object to doing

10  anything that is going to change where we are right now.  Like

11  any other witness that gets flustered and appears unsure, that's

12  what cross-examination is all about, and that's what this jury

13  is going to be determining.  In fact --

14          THE COURT:  Well, I don't think he's flustered.  I

15  think what -- what I'm trying to do is understand your objection

16  and how it applies, and I'm not totally clear on your objection

17  either.

18      So that's fine, we can just take a break, let them go, and

19  then we can talk through this information out of the earshot of

20  the jury.  Okay?

21          MR. RENN:  And, again, I would object to anybody

22  talking with this witness.  He is on direct examination, so I

23  don't think he is --

24          THE COURT:  Ms. Gomez is not going to coach him during

25  a break.  Okay?

O'Daniel - Direct

1            MR. RENN:  And, again, the same way with us.  Again, I

2    would object to talking through things.  I think he needs to

3    continue his direct examination, and when the direct examination

4    is finished, then I would start my cross-examination.  I would

5    object to any stoppage of that right now.

6            THE COURT:  No.  I need to hear it from out of the

7    earshot of the jury to know, with an informed basis, whether to

8    grant your mo -- your objection or not.

9        (End of bench conference.)

10           THE COURT:  All right.  As you-all can infer, we have

11   some things we need to talk through, and I don't want to waste

12   your time sitting here while the -- listening to the white

13   noise.  So we're going to take what I hope will be a short

14   break.  You guys can go back to the jury room, use the restroom.

15     It's a little bit in advance of when we would, but that's

16   okay, because we'll be able to keep making progress without you

17   just twiddling your thumbs.  We'll bring you back when we're

18   ready to move on.  Okay?  Thank you.

19           (Jury out 3:24 p.m.)

20                  C E R T I F I C A T E

21     I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

22   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

23

24
                s/Rebecca S. Boyd                November 26, 2022
25   Official Court Reporter                      Date

```
 1                              INDEX

 2   GOVERNMENT WITNESS:

 3   DETECTIVE TIM O'DANIEL                              PAGE

 4        Direct Examination by Ms. Gomez                 2

 5
                              EXHIBITS
 6

 7   GOVERNMENT:

 8        Exhibit 40A                                     8
          Exhibit 40B                                     8
 9

10   DEFENDANT:
     No exhibits
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```