```
 1                   UNITED STATES DISTRICT COURT
                     WESTERN DISTRICT OF KENTUCKY
 2                        LOUISVILLE DIVISION

 3
     UNITED STATES OF AMERICA,      )    Case No. 3:21-CR-00089-BJB
 4                                  )
             Plaintiff,             )
 5                                  )
     v.                             )
 6                                  )
     SALVADOR ABDUL JONES           )
 7                                  )    October 5, 2022
             Defendant.             )    Louisville, Kentucky
 8

 9                           * * * * *

10           TRANSCRIPT OF DAUBERT HEARING AT JURY TRIAL
                BEFORE HONORABLE BENJAMIN J. BEATON
11                  UNITED STATES DISTRICT JUDGE

12                           * * * * *

13   APPEARANCES:

14   For United States:      Alicia P. Gomez
                             Emily Lantz
15                           U.S. Attorney's Office
                             717 West Broadway
16                           Louisville, KY  40202

17   For Defendant:          Patrick J. Renn
                             Smith & Helman
18                           600 W Main Street, Suite 100
                             Louisville, KY  40202
19
     [Defendant present.]
20

21                      Rebecca S. Boyd, RMR, CRR
22                       Official Court Reporter
                          232 U.S. Courthouse
23                       Louisville, KY 40202
                           (502) 625-3777
24
     Proceedings recorded by mechanical stenography, transcript
25   produced by computer.
```

1      (Begin proceedings in open court at 8:51 a.m.  Jury out.)

2           THE COURT:  Let's go on the record in the United

3    States against Salvador Jones, Criminal Case 3:21-89.  Looks

4    like same counsel here today.

5      Turns out this is quite an interesting question, treatment

6    of historical cell site data.  Is Detective O'Daniel here?

7           MS. GOMEZ:  Yes, Your Honor.  He's --

8           THE COURT:  Okay.

9           MS. GOMEZ:  -- sitting outside.

10          THE COURT:  So here is where, I think all around, we

11   probably could have done a better job of anticipating this issue

12   and not been dealing with it at the -- on the fly.

13     At the final pretrial conference, this is the rough -- rough

14   unofficial transcript, I asked, "Are there going to be any

15   experts here?"

16     Government says, "I don't know that he'd be considered an

17   expert.  We do have cell phone pings.  I do intend to reduce --

18   introduce through Detective O'Daniel the cell phone information

19   for the defendant."

20     "Mr. Renn, do you think that's the sort of testimony that

21   would require qualifying someone as an expert?  Or are we just

22   needing to lay the foundation for him to say whatever he needs

23   to say about cell phone pings?"

24     "Your Honor, typically, that would be laying a foundation

25   for the admissibility of that evidence."

1      The Court said, "All right.  If, for any reason, you guys

2  think that they need to deal with actual Daubert-type questions,

3  then let us know at the beginning of trial."

4      So -- and we asked about summary exhibits or demonstratives.

5  The government mentioned the PowerPoint for Detective O'Daniel.

6  They said they would let Mr. Renn review that evidence before

7  trial.

8      So the PowerPoint you-all sent over on Friday?

9          MS. GOMEZ:  Yes, Your Honor.

10          THE COURT:  All right.  And --

11          MS. GOMEZ:  I will --

12          THE COURT:  -- Mr. Renn, did you request expert

13  disclosures at any point before trial?

14          MR. RENN:  Yes, Your Honor.

15          THE COURT:  When was that?

16          MR. RENN:  I don't have that, but I sent that out to

17  the prosecutors, and, again, I'd have to put my hands on it, if

18  you'll give me a moment.

19          THE COURT:  Well, Ms. Gomez, did you-all receive a

20  request to -- under the rules to disclose a summary of expert

21  testimony?

22          MS. GOMEZ:  Judge, I know that Mr. Renn generally

23  sends that out on every case I have with him, but I couldn't

24  tell you if I received it on this case, but I will say he

25  generally sends out a letter the minute he gets a case that

1    says --

2              THE COURT:  Okay.  And so you-all didn't send a

3    written summary of expert testimony, because you didn't think

4    this was really expert testimony?

5              MS. GOMEZ:  Judge, in reviewing the cases last night,

6    I think that it is expert testimony, after --

7              THE COURT:  I agree with --

8              MS. GOMEZ:  -- reviewing the cases, but it did not --

9    frankly, Judge, I was not preparing this case for trial.  I was

10   under the impression we were going to settle until we missed the

11   final pretrial conference.

12       So in all candor to the Court, I missed deadlines, because I

13   wasn't expecting the case to go to trial.  It was -- I was under

14   the impression, based on communications, that we were going to

15   settle, and so it has been a frantic dash --

16             THE COURT:  Okay.

17             MS. GOMEZ:  -- to prepare the case for trial.  So

18   certainly, now, as I said, after reviewing the caselaw last

19   night, I don't -- I don't dispute that this is expert testimony

20   that I was certainly late in providing.

21             THE COURT:  All right.

22             MS. GOMEZ:  But I will say in the initial discovery

23   production, Your Honor, there was that e-mail Mr. Renn was

24   talking about yesterday.  It's my understanding -- the paralegal

25   was able to pull it for me, where this isn't an e-mail I just

1    turned over last week.  This was an e-mail I had turned over on

2    December 10th of 2021.

3        So this wasn't -- this isn't completely out of the blue,

4    although, as the Court said, I didn't provide the normal

5    disclosure, and I own that, Your Honor.  Again --

6            THE COURT:  Well, I appreciate that, though it's

7    mitigated somewhat by the seeming acknowledgement or when this

8    came up at the final pretrial conference, there was no specific

9    request to treat this person as an expert either.  So my sense

10   is that, for whatever reason, both sides were not treating the

11   O'Daniel testimony as expert testimony.

12       All right.  Let's talk about the substance.  Here is -- I'm

13   just going to give you my read of the proof the government wants

14   to come in, and what the law says about that.  I'm going to do

15   that not because I'm making my decision right now, but in order

16   to streamline things, and you guys can push back or tell me

17   where I'm wrong.

18       It seems like the government wants to submit evidence on

19   three key points.  That this particular cell phone number pinged

20   specific cell towers in and around Louisville at specific times,

21   and for specific durations.  That information, I believe, is

22   drawn from the T-Mobile business records that we -- at least

23   some of which we looked at yesterday.

24       Second piece would be some level of explanation regarding

25   how the cell network operates in the United States generally,

1    and how it may allow for law enforcement and others to derive

2    conclusions about where a cell phone likely was based on

3    particular tower pings.

4        This is testimony that the Seventh Circuit in the Hill

5    decision and other courts -- though not uniformly, but many

6    other courts have described as expert testimony, because it's

7    not within the normal kin of a lay juror or judge.  But I think

8    often, government witnesses are qualified to discuss, in

9    general, how to derive some locational data and inferences from

10   cell phone -- or cell network operations.

11       And then the third piece, which is what we focused on the

12   most yesterday, for good reason, I think is this:  The specific

13   perimeters that are shown in the maps that are part of Detective

14   O'Daniel's PowerPoint.

15       And we, I believe, spoke relatively loosely yesterday about

16   TRAX data and software, and -- but I believe that what TRAX

17   provides or what O'Daniel derived from TRAX is those overlay

18   images of the perimeters associated with specific towers,

19   correct?

20               MS. GOMEZ:  I believe so.

21               THE COURT:  That's your understanding as well?

22               MS. GOMEZ:  Yes.

23               THE COURT:  Okay.

24               MR. RENN:  And that -- I don't agree with that.

25               THE COURT:  You don't agree with what?

1          MR. RENN:  That that's all he did in this case.  I was

2     able --

3          THE COURT:  I did --

4          MR. RENN:  -- to re --

5          THE COURT:  I didn't say that's all he did in this

6     case.

7          MR. RENN:  Well --

8          THE COURT:  I said that overlays were derived by him

9     from TRAX.  Is that your understanding?

10          MR. RENN:  And/or Google Maps Pro.

11          THE COURT:  Well, my understanding, based on what he

12     said yesterday, is the Google Maps is an overlay that shows, you

13     know, Louisville streets, landmarks, buildings, that sort of

14     thing, but that Google Maps wouldn't show the perimeter of a

15     particular cell tower.

16          MR. RENN:  I agree --

17          THE COURT:  It just --

18          MR. RENN:  -- with that.  I apologize --

19          THE COURT:  -- associated --

20          MR. RENN:  -- Judge.  Yes.

21          THE COURT:  Okay?

22          MR. RENN:  Yes.

23          THE COURT:  So based on -- there are two different

24     Reynolds decisions within this circuit, which is a little

25     confusing, but both of them are illuminating, and the Hill

1    decision from the Seventh Circuit, which surveys a lot of this

2    law, was also quite helpful, and the Hill decision cites Judge

3    Boggs' ruling in Reynolds.

4        Those decisions in light of just basic Daubert principles

5    lead me to think that if an ex -- if a witness can be qualified

6    as an expert, at least to the extent that he or she could

7    explain what sort of information may be derived from cell phone

8    pings, then an expert, typically, is allowed to reliably -- or

9    understood to reliably extrapolate from cell -- historical cell

10   phone data and testify to conclusions that a phone did, in fact,

11   connect with the tower located at some position, and that the

12   phone was not located somewhere far from the tower.  That's the

13   express holding of the Reynolds decision.

14       The conclusions that are much more debatable are that an

15   expert witness could pinpoint a specific location where a cell

16   phone -- I'm just saying cell phones.  You know, no need to make

17   the extra logical leap about who was using the cell phone and so

18   forth, but that the cell phone was located in a particular spot.

19       I think it's questionable, at least, whether the caselaw has

20   blessed a law enforcement officer testifying about the specific

21   reach of a specific tower, and what territory it might capture.

22       And though the caselaw doesn't address this last piece,

23   which is relevant to our -- the caselaw that I have reviewed

24   doesn't address this last piece as specifically as others, the

25   notion of reliance on a proprietary or government data set that

1    in -- that sort of maps the perimeter around a particular tower

2    seems potentially problematic, at least when it hasn't been

3    reviewed in advance or subject to critique out in the scientific

4    community.

5        So my questions, if we were going to try to qualify an

6    expert to talk about those specific perimeters, I mean, I think

7    I'd have a number of questions, including what is the sort of

8    source, and who came up with that perimeter data?  Are these

9    perimeters represented in that PowerPoint static or are they

10   dynamic, changing under different, you know, time and other, you

11   know, conditions?

12       Are the perimeters, which are presented in a very defined,

13   distinct, certain way, are they actually subject to an error

14   rate?  Is there, you know, a bleed?  How are they calculated?

15   What, if any, role does the drive test that was mentioned

16   briefly yesterday have to play here?

17              MS. GOMEZ:  Judge, I need --

18              THE COURT:  And --

19              MS. GOMEZ:  -- to correct something there.  The

20   paralegal made me aware that he did not, based on the time, have

21   the ability to do a drive test in this case.

22              THE COURT:  Okay.  So we can throw that out.  And then

23   is our particular witness prepared to discuss the limitations of

24   this technique as arose in, for example, the Hill decision and

25   Judge Maloney's decision in the Reynolds case from the Western

1    District of Michigan?

2        So how does this all cash out?  You know, I believe expert

3    testimony is necessary to explain the cell network and any

4    locational information that could be derived from it before the

5    jury ought to hear about it, so I think we'd need to qualify

6    O'Daniel as an expert on that subject.

7        If he's qualified under existing caselaw, it does not seem

8    terribly problematic for him to testify regarding the location

9    of specific cell tower sites where this phone connected, so long

10   as the testimony explains the limitation -- the limitations of

11   using historical cell site locational information in this

12   manner.

13       Right now, I do not believe O'Daniel could testify that the

14   phone was definitely within the designated perimeters set out on

15   that PowerPoint.  And that hinges on my sort of presumption

16   informed by yesterday's testimony in our discussion that he

17   seems like he's not in a position to testify directly to how

18   that perimeter was calculated or generated.

19       So if we -- if we avoided this perimeter issue entirely,

20   that takes -- based on my current understanding of the record,

21   that would take the sort of TRAX issue out of this, and the

22   government would not be allowed to say, "Here is the area that,

23   you know, we believe or we know this phone was located in."

24       So I think we're talking about a new, you know, PowerPoint

25   presentation, if you're going to use a PowerPoint presentation,

1    to -- to present the limit -- the much more limited set of

2    information appropriately caveated without -- without the

3    perimeter, that feature in the draft we saw at the end of the

4    day yesterday.  So that's where -- where I am.

5        Let me ask, Ms. Gomez:  Do you have a significantly

6    different understanding of O'Daniel's ability to testify

7    regarding these perimeters?  Am I way off there?

8            MS. GOMEZ:  I think he'll be able to provide the Court

9    more information about how those perimeters are determined, but

10   not being able to speak with him last night, I'm not 100-percent

11   sure on that, but I would imagine that he can provide how the

12   perimeter is established.

13       And for purposes of -- just for the record, the United

14   States does not intend to say, "The defendant is at 917 West

15   Jefferson with his cell phone."  That is exactly what the Court

16   is saying, and we're in agreement with that the -- this

17   technology, this information allows for us to say that he was

18   feeding off of this cell tower that encompasses -- the radius is

19   pretty huge.  That encompasses this huge radius, which I think

20   that Detective O'Daniel will be able to shed light on how that

21   radius is determined.

22       I believe that the software -- and that's why I think --

23   yeah.  I believe that the radius is determined by the software

24   provider.  It's part of the information that they receive when

25   they -- when they put it into the system.

1    So -- but, again, the radius is -- I'm not disputing the

2    radius is rather large, and we wouldn't be able to say, "The

3    defendant was standing on this street corner with his phone."

4          THE COURT:  Well --

5          MS. GOMEZ:  We only --

6          THE COURT:  -- we all agree about that.  Let's --

7          MS. GOMEZ:  Yeah.

8          THE COURT:  So let's just talk about the radius.

9    Yesterday, you mentioned some DOJ map or database as well.  Is

10   that a thing?  What did we learn about that overnight?

11         MS. GOMEZ:  We did learn that there is a law

12   enforcement website.  We weren't able to access it, because,

13   obviously, my lead detective is not somebody who does this.  And

14   it is a -- it is not a publically-available website is my

15   understanding.  It's a law enforcement -- it's a government

16   website.

17         THE COURT:  Have courts allowed testimony based on

18   this nonpublic government website?

19         MS. GOMEZ:  Yes, Your Honor.

20         THE COURT:  And can you give me --

21         MS. GOMEZ:  But I don't have any caselaw on that.  I

22   will say --

23         THE COURT:  We just know it has happened in the past,

24   but we don't know -- can't point to a judicial decision?

25         MS. GOMEZ:  Judge, I will -- correct.  I will say I

1    did review a transcript last night.  Judge Boom did not make a

2    finding on the transcript I reviewed, but there was a case in

3    our district, Rob Bonar from my office tried it, Dante Watts and

4    Carlos Catalan, and this kind of information, and from my

5    conversation with Mr. Bonar, was allowed by Judge Boom as long

6    as -- first of all, they did have a Daubert hearing.

7        And then, secondly, it was allowed as long as the government

8    ex -- made sure to -- it's actually exactly what the caselaw

9    says.  Make sure that the jury understands that there is this

10   huge margin of error, essentially.

11              THE COURT:  Yeah.

12              MS. GOMEZ:  But -- but I did find a case.  That was a

13   little different, because in that case, not only did they have

14   historical cell site information, they also had pings.  But,

15   again, in my conversation with Mr. Bonar and my review of Judge

16   Boom's transcript in that case, this was something that was

17   allowed just as long as, again, that caveat is given to the

18   jury.

19              THE COURT:  When -- when you say pings, what do you

20   mean to distin -- by distinguishing that from historical cell

21   site data?

22              MS. GOMEZ:  Yes, Your Honor.  So the historical cell

23   site data provides law enforcement with the records you saw

24   yesterday that indicate the cell phone fed off of this tower

25   at -- for this amount of time.

1      The pings are different, because the pings are -- law

2   enforcement is receiving the pings in -- in 15-minute

3   increments, and, normally, my understanding of it is that --

4           THE COURT:  Oh.  When you're not on -- when you're not

5   on the phone, but the phone --

6           MS. GOMEZ:  Right.

7           THE COURT:  -- is just --

8           MS. GOMEZ:  So we are --

9           THE COURT:  -- touching a tower?

10          MS. GOMEZ:  -- pinging the phone to make it say where

11  it is.  To connect to a tower to say where it is --

12          THE COURT:  All right.

13          MS. GOMEZ:  -- connected.

14          THE COURT:  And we don't have -- we don't have that

15  here?

16          MS. GOMEZ:  We don't have --

17          THE COURT:  But that's relevant mainly for times when

18  someone is not using the phone.  If someone is on a phone call,

19  then you would rely on the cell phone records from the phone

20  company?

21          MS. GOMEZ:  Yes, Your Honor.

22          THE COURT:  Okay.  All right.  Well, look, there's no

23  question that this stuff is allowed in courts all across the

24  country, but that, of course, doesn't mean that these judges are

25  performing the sort of analysis that we're talking about that I

1    think the law requires, and it doesn't mean that it's, you know,

2    challenged and not, you know, worked out in advance, so that's

3    why it's important to take a -- take a close look.

4       All right.  So is the government okay if I rule that

5    O'Daniel can't use the PowerPoint in its current form and can't

6    use the specific perimeters that are set out on those maps?

7            MS. GOMEZ:  Judge, I believe the problem would be,

8    obviously, that the software creates that parameter.  I would

9    ask that the Court hear from Detective O'Daniel first about the

10   perimeters, and how that -- how that he got that information,

11   how that's a part of the PowerPoint before excluding it.

12           THE COURT:  All right.  Is there anything else about

13   what I said -- anything I said that you object to?

14           MS. GOMEZ:  In terms of the PowerPoint?

15           THE COURT:  Just anything.  I just kind of gave you

16   guys an explanation of what I believe is the evidence you're

17   trying to admit, what I believe the law generally says about

18   this, and -- and what I think should and shouldn't come in

19   subject to talking with O'Daniel.

20      I am inclined to not allow the perimeters to be shown and

21   not allow him to testify that he used some software to tell him

22   that, you know, this phone was when the -- was within this

23   radius.  I'll hear from him, but that's my inclination.

24      Is there anything else about what I've said so far that you

25   object to?

1          MS. GOMEZ:  I don't object to that, but I will say

2     this, Judge:  With regards to the parameters, because the circle

3     you see on the map is so large, I believe that it actually works

4     in the defense favor for the circle to be there.  Because if we

5     remove the circle and just have, "He's pinging off of this

6     tower, he used this tower, according to the cell phone records,"

7     then the jury is led to believe that that tower, that that --

8     he's closer, essentially, to me.

9        I mean, I think that that --

10         THE COURT:  Well, maybe in the first instance, but I

11    think Mr. Renn would stand up and say, "You're not saying he's

12    right at this location, are you?  It could be this far away,

13    this far away."

14       So that's the sort of thing, where is the line, how reliable

15    is this, what's your margin for error, that's all stuff that can

16    be, I think --

17         MS. GOMEZ:  Cross.

18         THE COURT:  -- profitably questioned on

19    cross-examination.  So I understand your point, that --

20         MS. GOMEZ:  Yes.  I just --

21         THE COURT:  -- it's a big perimeter, but I'm not sure

22    any of us know exactly the inference that a juror would draw

23    about that.  Whether it's, you know, undue certainty within the

24    perimeter or if it's, you know, undue doubt regarding the area

25    covered by the perimeter.  We're not sure, and that's why the

1    sort of bright line about that perimeter troubles me.

2        All right.  Mr. Renn, I presume you agree with everything I

3    said?

4              MR. RENN:  Good morning to you, Your Honor.

5              THE COURT:  All right.  Go ahead.

6              MR. RENN:  Your Honor, number one:  Prior to the

7    witness leaving the stand on direct examination, I did object.

8    I said that this would be improper to have him leave.  In my

9    view, he was floundering, he was flustered and certainly not

10   giving effective testimony.

11       He has now had the opportunity overnight to, you know,

12   regroup and come in and, presumably, be a better witness and

13   especially get some softball questions in here without being in

14   front of the jury.  So that was objection number one.

15             THE COURT:  What softball questions are not in front

16   of the jury?

17             MR. RENN:  Questions about reliability, error rate and

18   things like that.  He's not sitting in front of 16 strangers

19   having to do this.

20             THE COURT:  But isn't that always the case whenever we

21   have a Daubert hearing?

22             MR. RENN:  Well, again, this case here, the witness

23   was already sworn to testify and was in front of a jury.

24             THE COURT:  But he hadn't been admitted as an expert.

25   No one had tried to qualify him as an expert yet.

1          MR. RENN:  And the caselaw, as the Court --

2          THE COURT:  And when you -- when you objected to the

3     basis for his testimony, that's when we had our sidebar, and

4     that's when I cut him off so that we could explore these

5     questions further.

6       So I don't know that -- I don't know how halting his

7     testimony so that we could have a Daubert hearing to pursue your

8     own objection is error or prejudicial in any way.

9          MR. RENN:  Again, my objection is noted again.

10         THE COURT:  Okay.  Overruled.  Go ahead.

11         MR. RENN:  Secondly, Your Honor, the Court -- I did

12    file the motion to exclude late evidence that was coming in in

13    large volumes.  The Court did deny that by a text order.  I got

14    this last evening.  It was entered yesterday morning.

15      And at the conclusion, it says you deny the motion to

16    exclude without prejudice to the defendant raising specific

17    objections to specific evidence during trial.

18      I object to this expert testimony coming in.  We all now

19    agree that, clearly, cell site testimony is expert testimony.

20    As to any statements that I may have made during the final

21    pretrial conference, if it was an error, then I certainly admit

22    that as being ineffective on behalf of Mr. Jones.

23      But the caselaw the Court cited, the one that I pointed out

24    to the Court, the Reynolds case, and this was the district court

25    case, and that did state thus, assuming that the government lays

a proper foundation, inaccurately represents historical cell

site analysis limits at trial, the expert testimony is reliable,

and a Daubert hearing is unnecessary.  But, again, here it does

reference that it's expert testimony.

The Hill case cited by the government and the other Reynolds

case cited by the Sixth Circuit, 626 F. Appendix 610, clearly

does indicate that cell site testimony is expert testimony.

There's one government.  The government clearly is on notice

that this was expert testimony.  We just heard from the

prosecutor that said her partner, Rob Bonar, who was in here, at

one point, had this very issue came up -- to come up in another

trial, and they did, in fact, have a Daubert hearing, because

they realized that that was necessary.

The issue I initially made was a confrontation issue under

Bullcoming, and that was based on that e-mail that was cited.

Under the Rule 16, and, quite frankly, I'm not sure if this goes

into effect December 1, 2022, or if the other part, but assuming

this is the part, when the defense makes a request, time to

disclose, the Court, by order or local rule, must set a time for

the government to make its disclosures.  The time must be

sufficiently before trial to provide a fair opportunity for the

defendant to meet the government's evidence.

Again --

THE COURT:  Well, hold on.  Is that rule in effect or

not?

```
 1              MR. RENN:  Your Honor --
 2              THE COURT:  You said it may not be?
 3              MR. RENN:  It may not be, because I've got here the --
 4              THE COURT:  What --
 5              MR. RENN:  -- text is --
 6              THE COURT:  What are you -- what rule are you quoting?
 7              MR. RENN:  Rule 16.
 8              THE COURT:  What -- well, Rule 16 is long.  What part
 9     of Rule 16?
10              MR. RENN:  Subsection G.  I'm sorry.  And it says here
11     in a bracket, "Text is subsection (a)(1)(G) effective December
12     1, 2022.
13              THE COURT:  Okay.  That date --
14              MR. RENN:  Absent cons --
15              THE COURT:  That date hasn't passed, that is?
16              MR. RENN:  Again, I'm not sure which -- if that was
17     the one above it or the one below it.
18              THE COURT:  Well, the version of Rule 16(G) that I'm
19     looking at does not include that information.
20              MR. RENN:  Again, clearly, it does require --
21              THE COURT:  "At the defendant's request, the
22     government must give to the defendant a written summary of any
23     testimony that the government intends to use under Rule 702, et
24     cetera, during its case in chief at trial."
25          And so just -- the procedural stuff is frustrating to me for
```

1    the reason I said earlier, because we're dealing with it on the

2    fly, but I don't know that it's an error that we can lay all on

3    one side or the other, because there wasn't a deadline put in

4    place for disclosure.

5        It sounds like there was a blanket request at the beginning

6    of trial, and then when this -- when I raised this subject at

7    the final pretrial conference, for these very reasons, neither

8    of you thought this was a question of expert testimony.  Neither

9    of you thought that we needed a Daubert hearing.  The defendant

10   did not file a motion to exclude on these grounds.

11       I invited you-all to let me know before trial or at the

12   beginning of trial if this is something we needed to cover, and

13   no one ever said boo.

14       The first objection was based on the confrontation clause,

15   which I don't believe is implicated, and so when all of us

16   together realized yesterday afternoon that, hey, we are dealing

17   with some stuff or he is testifying in a manner that makes us

18   concerned that this might need to be expert testimony and could

19   be subject to challenge, at that point, we called timeout and

20   took this opportunity to do our research and get our ducks in a

21   row.

22       So procedurally, I think it's perfectly reasonable, if

23   inefficient, how we ended up here, and I don't believe that is a

24   basis to exclude anything on its own when, right now, we have

25   the opportunity to test this potential testimony, and I've

1    already told you the concerns I have about the most significant

2    aspects of it.

3       So unless there's anything else to add on the procedural

4    front, I'd be curious to hear what your position on the merits

5    of this testimony are.

6             MR. RENN:  Well -- well, again, I do have the

7    procedural that I still need to finish.  Again, at the time that

8    we had the final pretrial conference, I had not received this

9    PowerPoint program, and, again, whether I had that e-mail or

10   not, I'm not sure, but I, certainly, got that late.

11      And I would cite to the Court I did --

12            THE COURT:  You got the PowerPoint late.  You're not

13   saying that you got the e-mail late, correct?

14            MR. RENN:  Well, again, I believe I got it on Friday,

15   but it may have been sent earlier, I'm not sure, but I know it

16   came on Friday as well.

17            THE COURT:  But if you had received an e-mail earlier

18   in the case disclosing the use of the TRAX software to generate

19   information about historical cell site location data, then you

20   would have been on notice that the government was planning to

21   offer testimony based on cell phone data.

22      And, again, at the final pretrial conference, you also were

23   on notice that there was going to be a PowerPoint on the subject

24   of historical cell site location.  And I don't understand, given

25   those at least two data points, how we could conclude that you

1    weren't on notice of this until Friday.

2            MR. RENN:  Okay.  Then I'm going to cite to the case I

3    did e-mail the Court, United States versus Nacchio,

4    N-A-C-C-H-I-O, 555 F.3d 1234, 2009 case from the Tenth Circuit.

5    In that case, the defendant believed that he would be able to

6    lay the foundation for his expert when the expert testified at

7    trial.  The Court stated that's not proper.  You have to give

8    the notice that's required under 702 through 705.

9       That wasn't done, and this was en banc decision where the

10   Court excluded that, and it has been cited 569 times throughout,

11   so this is good established law.

12           THE COURT:  That was a criminal case?

13           MR. RENN:  Yes.

14           THE COURT:  And the defendant had requested expert

15   disclosure?

16           MR. RENN:  No.  This was where the defendant wanted to

17   put on his own rebuttal expert and then wasn't permitted to do

18   so, because he didn't give the government notice as otherwise

19   would be required under Rule 16.

20      And as to --

21           THE COURT:  That seems -- that seems very

22   distinguishable, because here, there was no surprise that

23   Detective O'Daniel was going to come and testify about

24   historical cell site location.

25      The problem is no one raised an issue about any expert

1    qualifications until he was already on the stand.

2           MR. RENN:  And --

3           THE COURT:  Despite me prompting both sides on this

4    very issue.  All right.  Go ahead.

5           MR. RENN:  I did have an attorney in our office to

6    reach out to Adrian Lauf, and Adrian is a professor at the

7    University of Louisville Speed scientific school.  He's

8    testified in other cases that I've had and, certainly, many,

9    many other cases in federal court about cell site locations.

10      He recently testified in a case, and I don't know if it was

11   a state case or a federal case, but, in particular, about this

12   TRAX software.  He believes that it is baseless.  That all the

13   individual that is going to testify here today does like they

14   do, and that is plug in the information.  Anybody can do it, and

15   then they're allowed to make opinions after that.

16      He would be --

17          THE COURT:  Are you disclosing him as a rebuttal

18   expert?

19          MR. RENN:  He would be available today 12:00 to 3:00

20   by Zoom or he could be here Friday at 2:30.  And I would,

21   obviously -- you know, this typically would be done ex parte,

22   but I would need funds in order to retain him.

23          THE COURT:  Well, let's see if the TRAX stuff even

24   comes in.

25          MR. RENN:  Yes, sir.

1           THE COURT:  And right now, like I said, I'm inclined

2    to exclude everything to do with TRAX and just let him testify

3    based on whatever inferences he can reliably draw from those --

4    the call records that we looked at, which is going to be a much

5    less specific presentation.  It's not going to have those

6    perimeters on there, which I believe, and we'll hear -- hear

7    from him in just a second, but I believe that would eliminate

8    reliance on TRAX.

9           MR. RENN:  And the same would be true, Your Honor,

10   with -- you had asked about the DOJ sites.  Again, I think

11   that's a lack of confrontation.  You know, I can't get access

12   to --

13          THE COURT:  I don't think they can -- I don't think he

14   can testify that he knows that the cell phone was in a certain

15   perimeter based on some website that you and I don't have access

16   to.  Okay.  All right.

17          MS. GOMEZ:  Judge, may I add something really quickly?

18          THE COURT:  Yeah.

19          MS. GOMEZ:  Just we were confirming that those KMZ

20   files that Detective O'Daniel talked about yesterday with --

21          THE COURT:  I don't know what you're talking about.

22          MS. GOMEZ:  Essentially, it's the data that goes into

23   the PowerPoint.  It's the -- and my team can talk about it

24   better than me, but it's the data that goes into the PowerPoint.

25   As he was explaining, he receives those KMZ files.

1    THE COURT:  It's a type of data file --

2    MS. GOMEZ:  The Google Earth, it's those files, all of

3  that was provided in initial discovery in December of 2021.  So

4  just, again --

5    THE COURT:  The Google Earth part?  What about --

6    MS. ALIC:  The file that plugs into Google Earth.

7  Yes.  Like the map portion with the data in it initially.

8    THE COURT:  Does that include the perimeter or only --

9    MS. ALIC:  It should.

10    THE COURT:  -- the map?

11    MS. ALIC:  Yes.

12    MS. GOMEZ:  It should include the perimeter, because

13  I've been notified that the perimeter is determined by the phone

14  company, T-Mobile.

15    MS. ALIC:  And I don't think he can go in and adjust

16  that at all.

17    THE COURT:  All right.  Well, let's -- why don't we

18  hear from him briefly on this?  I don't know that we're going to

19  be in a position to let him go right back on the stand, but I

20  think right now, while it's top of mind, we should hear from him

21  about what he did to produce this PowerPoint, and then I may

22  need to think on it a little more before making a specific

23  ruling, but we can go on with your other witnesses who I presume

24  are available.

25    MS. GOMEZ:  I believe my first witness is here at

1   10:00 a.m., Judge.

2           THE COURT:  Okay.

3           MS. GOMEZ:  Other than Detective O'Daniel, obviously.

4   He's outside.

5           THE COURT:  All right.  Are you -- well, you might see

6   if that person could arrive a little -- a little earlier.  I

7   don't know if that's possible or not.

8       Okay.  Anything else before we call O'Daniel in, Mr. Renn?

9           MR. RENN:  No, Your Honor.  I am going to get the

10  Court's order, the pretrial order, because we believe that the

11  August 3rd was the cutoff for experts, so I do want to get that

12  docket number in, have that as part of the record.

13          THE COURT:  Okay.  I mean, look, I think that's

14  relevant but not dispositive, because, as I said, when this

15  subject came up, nobody thought he -- perhaps mistakenly, that

16  this was going to be an expert witness, even though we generally

17  knew what the basic nature of his -- of his testimony, and I

18  think that would have been enough, under this caselaw, to know

19  that usually, you need to qualify somebody for that.

20          MR. RENN:  Again, I believe the --

21          THE COURT:  I think all this --

22          MR. RENN:  -- the government's on notice of that, and,

23  certainly, their office was aware --

24          THE COURT:  I think both sides were on notice of that.

25      All right.  Anything, Ms. -- anything else, Ms. Gomez,

DIRECT - O'DANIEL

 1   before he comes in?

 2           MS. GOMEZ:  No, Your Honor.

 3           THE COURT:  All right.  Are the jurors here yet,

 4   Scott?

 5           COURT SECURITY OFFICER:  I think we're waiting on one

 6   or two.

 7           THE COURT:  All right.  Just let me know when they're

 8   ready.

 9           THE REPORTER:  Are we reswearing him, Judge?

10           THE COURT:  Yeah.  Go ahead.

11       (TIMOTHY O'DANIEL, called by the government, was sworn.)

12           THE COURT:  All right.  Why don't you ask some

13   questions about how we got here, and don't be surprised if I

14   have some questions of my own, and then Mr. Renn will have some

15   questions for you too, Detective.

16   A.  Yes, Your Honor.

17                       DIRECT EXAMINATION

18   BY MS. GOMEZ:

19   Q.  Okay.  Detective O'Daniel, if you could, for the record,

20   just state your qualifications with regards to the historical --

21   mapping historical cell site location information.  What

22   training have you received, what are your qualifications for

23   that?

24   A.  I began training with a digital evidence class in 2018 put

25   on by the Michigan State Police -- or it's a private company

DIRECT - O'DANIEL

1    through the Michigan State Police was the head instructor.  From

2    there, I went on to the -- it's the ZetX 40-hour basic course,

3    the ZetX subject matter expert course, the PenLink basic and

4    advanced course, and a cili -- cell site forensic analysis

5    course also put on by ZetX.

6    Q.  Okay.  What is ZetX?

7    A.  ZetX is -- was the company that owned TRAX.  Oh.  Until they

8    were bought out last year by LexisNexis.

9    Q.  Okay.  And -- so in your time doing this, so you've had

10   occasion to deal with this cell phone technology?

11   A.  Yes.

12   Q.  Is that what you're talking about?  Okay.

13          THE COURT:  Well, how about we just -- in a sentence,

14   to start, can you describe what you learned at each of those

15   courses you mentioned?

16   A.  Yes.  So the first course was really just like a -- like an

17   intro course to the types of technology.  The ZetX basic

18   course --

19          THE COURT:  What type -- what types of technology?

20   A.  The cell site analysis and reading the reports and reading

21   the records that are returned from the cell carriers.

22          THE COURT:  For instance, the T-Mobile records we

23   looked at yesterday?

24   A.  Yes, Your Honor.

25          THE COURT:  Okay.  All right.  And then you did the

DIRECT - O'DANIEL

1    ZetX 40-hour basic course.  What was that about?

2    A.  Yes, and it's small -- a small part about their -- their

3    actual tool, but more about the analysis of cell site records

4    and how the location information within the cell site records

5    can be used to track a device's locations.

6              THE COURT:  So similar to the Michigan State Police --

7    A.  Yes.

8              THE COURT:  -- training?

9    A.  Yes.

10             THE COURT:  Okay.  And then the subject matter expert

11   course from ZetX, did that focus more on the TRAX software, and

12   how it can be used?

13   A.  It was more on the court presentation and creating --

14   creating the actual -- the PowerPoints and the animations that

15   are used, and to show -- and to qualify you as an expert in,

16   like, Daubert hearings or hearings of -- hearings of that

17   nature.

18             THE COURT:  All right.  I'm asking a few more

19   questions than I normally would just because we're low on time,

20   and I don't want to keep the jurors waiting any longer.  But you

21   talked yesterday about the -- about two different pieces of

22   software or data.  One is Google Earth, and one TRAX.  Could you

23   explain the difference between those, if any?

24   A.  Yes, sir.  So Google Earth is just the mapping of -- the

25   mapping portion of that, but TRAX produces a file.  Basically,

DIRECT - O'DANIEL

1    it's -- essentially, it's just like a demonstrative of the -- of

2    the cell phone records.  So they take the information from the

3    cell phone -- the actual cell phone re -- search warrant return.

4    You ingest it into their software, and then it spits out the --

5             THE COURT:  So that gives you the tower location --

6    A.  Yeah.

7             THE COURT:  -- correct?

8    A.  Yes.

9             THE COURT:  What gives you the perimeter?

10   A.  So those are estimated cell site locations.  Those are --

11            THE COURT:  Estimated by whom?

12   A.  By TRAX.  By the people who make TRAX.

13            THE COURT:  And do you understand how the TRAX

14   software developers go from the -- from mapping the cell tower

15   to mapping the perimeter that wraps around that tower?

16   A.  I don't -- so I understand the horizontal plane that they

17   use, and it's -- it's -- that has to do with radiofrequency and

18   radio -- and the ability for that sector or that cell site to

19   communicate with the actual mobile device.  The distance and

20   specific area for a device will not be able to be set by those

21   records.

22            THE COURT:  What is necessary to set that specific

23   perimeter?

24   A.  A drive-test scan will help out.  So you take a forensic

25   tool, and you scan the actual -- or you go to the scene, and you

1    see where that device is communicating with those towers.

2             THE COURT:  This is something separate from -- is this

3    separate or the same as the perimeter that we saw on the

4    PowerPoint?

5    A.  This is separate.  This is -- this is -- this is to confirm

6    those -- those -- the usage of that device on the cell site.

7             THE COURT:  So in layman's terms, would someone doing

8    a careful drive test take a perimeter overlay for the software

9    produced -- the TRAX software produced and would take a phone of

10   the same type and test whether it was hitting that same tower

11   from locations within the perimeter set out in the software

12   overlay?

13   A.  Yes.  What you would -- what you would see is he -- the cell

14   phone could be in a specific scene, area, during that time and

15   be utilizing that tower, and that -- and you would overlay that

16   or show that separately from the -- from the actual -- the

17   actual horizontal plane, which is that big purple blob in the --

18            THE COURT:  All right.  So this is something that a

19   witness might do to corroborate the software --

20   software-generated imagery on the map, but that's not how the

21   TRAX -- the TRAX software doesn't rely on a drive test.  That's

22   something totally separate, right?

23   A.  Yes.

24            THE COURT:  All right.  Did you do a drive test in

25   this case?

1    A.   I did not.

2            THE COURT:   Okay.  So we can set that to the side.

3        What about the -- did you rely on any government cell site

4    maps --

5    A.   So to --

6            THE COURT:   -- in creating your PowerPoint?

7    A.   Yes, Your Honor.  So not -- not in the -- not in the

8    PowerPoint.  To the best of my re -- so the way that I ensure

9    that T-Mobile's records are right for their cell site is I

10   just -- I double-check the cell site information through NDCAC,

11   which is the National Domestic Communications.

12       It's a -- it's a tool that's put on through the Department

13   of Justice and FBI, and it basically takes historical cell site

14   information, and you can say, "Yes, this tower existed," or,

15   "Yes, this -- this cell site existed during -- during this

16   time."  And, basically, what you do is you go back to T-Mobile's

17   records from 2021 and say, "Yes, this is correct," and --

18           THE COURT:   But does that speak to the tower site in

19   existence or does it speak to the perimeter that we saw in the

20   PowerPoint?

21   A.   That speaks to the tower site in existence and its sector.

22           THE COURT:   So the perimeter that we're talking about

23   is only coming from TRAX?

24   A.   Yes.

25           THE COURT:   Okay.  All right.  Why don't you ask him

1   about using TRAX?  But maybe not that long, because I don't know

2   that we're going to --

3           MS. GOMEZ:  Okay.

4           THE COURT:  -- get there.

5   BY MS. GOMEZ:

6   Q.  In terms of the TRAX software, if you could tell us, how

7   does it -- I guess, does it get any information, to your

8   knowledge, you get from the cell phone company, the perimeter?

9   How does TRAX -- you don't know anything about how that

10  perimeter is established --

11  A.  No.

12  Q.  -- is that what you're saying?  Okay.  And so how does

13  TRAX -- once you use it, you put in the information, and does it

14  essentially just tell you where that cell tower is located, and

15  it overlays Google on top of it so you can see geographically

16  with buildings and such where it is?

17  A.  Yes.  So it takes the actual cell phone records, and that --

18  excuse me.  The latitude, longitude of the cell site.  It maps

19  that location of it, and then also, in those records, are a

20  sector of that cell site.  So cell sites are shaped on three

21  sectors, typically, and instead of doing sector -- you know,

22  this sector, it's saying it's utilizing this sector.

23      Now, it does make a general estimation on -- or estimate on

24  the distance of the -- of the -- of the actual cell site,

25  radiofrequency or radio bandwidth, that it can reach out, but it

DIRECT - O'DANIEL

1    shows -- it shows the usage of that cell site and sector.

2    Q.   Okay.  In other cases -- obviously, in this case, you didn't

3    do a drive test, but other times that you have used -- how many

4    times would you say you have used TRAX to map cell phone data

5    like you did in this case?

6            MR. RENN:  I'm going to object to that, Your Honor.

7            THE COURT:  Why?

8            MR. RENN:  Because I don't think his prior use has

9    anything to do with this particular case.  He didn't do a

10   drive-by --

11           THE COURT:  Well --

12           MR. RENN:  -- in this case.

13           THE COURT:  -- this is -- this is also relevant to his

14   qualifications to testify generally, and I'm not going to

15   monitor -- I'm not going to word check specific questions when

16   we're sitting here outside the presence of the jury trying to

17   figure out if this guy is qualified and on what.

18      So -- but I think TRAX is, perhaps, unnecessarily

19   distracting in specific right now, particularly given what we've

20   already discussed.  Why don't we just -- and this -- I jumped

21   ahead to this issue based on those four trainings.  But why

22   don't you just go back to the beginning and ask the questions

23   you normally would regarding qualifications and so forth --

24           MS. GOMEZ:  Okay.

25           THE COURT:  -- in a general sense rather than on the

DIRECT - O'DANIEL

1    specific software?  Okay?

2            MS. GOMEZ:  Okay.

3            THE COURT:  And the software may be relevant to that,

4    but it's a different question.

5            MS. GOMEZ:  Okay.

6    BY MS. GOMEZ:

7    Q.  So you indicated you've been working in this field,

8    essentially, with this type of data since what year?

9    A.  Approximately 2018.

10   Q.  Okay.  And how many times would you say you have utilized

11   the training provided to you to map historical cell site

12   location information?

13   A.  To specifically map?  I mean, we -- I do, I mean, thousands.

14   I mean, probably upward near 1,000.  I was doing probably 300 a

15   year ever since 2018, 2019.

16   Q.  And in terms of the mapping that's provided through the

17   historical cell site location information, specifically

18   historical cell site information, not cell phone pings, that

19   data, how accurate is it in terms of where the cell phone is

20   located?  Do you receive any kind of training on that?

21   A.  No.  I mean, no.  You will never be able to, like, pinpoint

22   it exactly, like the cell phone is in this -- at this

23   intersection.  You will -- I mean, the analysis is is we look --

24   or I look at the cell sites used prior to an incident, during an

25   incident, and then after the incident, and then all that

DIRECT - O'DANIEL

1   information is provided through the detective.

2        But, you know, you would never take, for example, like, some

3   outlier cell site hit or something and say for sure that -- that

4   that -- that device is there.  You would say, "Okay.  It was

5   using this cell site, this cell site.  It was in this area,"

6   and -- but you would never say, like, specifically, it was at --

7   at a specific point.

8   Q.   Okay.  And with your understanding of this technology, is it

9   important to stay up to date with this technology?  Is it --

10  A.   Yes.

11  Q.   -- ever changing?  Okay.

12  A.   Yes.

13  Q.   What types of training do you do to maintain your -- stay up

14  to speed on developments?

15  A.   So I've -- I've trained -- every year, there is a -- there

16  is a conference.  I've gone to multiple conferences every year,

17  and the name of the conference escapes me right now, and I

18  apologize, but it's -- it's to stay up to date on the

19  terminology, the technology, the information that's going to be

20  relevant to search warrants and then the search warrant returns

21  and the records, and -- and then also what that -- with the new

22  cell site analysis.  For example, 5G is an up-and-coming

23  technology.  We're starting to really get into that.

24  Q.   Okay.  Do you -- as part of your training in preparing these

25  types of reports, do you interact with representatives from

DIRECT - O'DANIEL

1   phone companies regularly?

2   A.   Yes.  Not -- yeah.  I mean, I probably call AT&T or T-Mobile

3   or Verizon maybe once a week or thereabouts.

4   Q.   Okay.  And in terms of testifying in court, how many times

5   would you say you've testified to this type of data?

6   A.   Approximately four or five, six, somewhere around there.

7   Q.   Okay.  But you said you have -- you were processing the data

8   and providing reports roughly three -- three hundred times a

9   year?

10  A.   Yes.

11  Q.   Okay.  Could you explain what is the KMZ file that you

12  receive or we received in this case?

13  A.   It's just a zipped file of the actual -- you insert the

14  search warrant return into the software.  The software produces

15  a KMZ file, which is just the actual search warrant return, the

16  information from the search warrant return, and then in a -- in

17  a -- in a -- and it layers it on top of a Google Earth so that

18  it's easy -- it's basically a -- for lack of a better term, a

19  forced multiplier.  Like, instead of mapping out every location

20  and using every sector, I can drop it in there, and it produces

21  one within fifteen, twenty minutes.

22  Q.   Okay.  So the KMZ file, would that encompass -- would that

23  be generally what we're seeing on the PowerPoint?

24  A.   Yes.

25  Q.   Okay.

DIRECT - O'DANIEL

1              THE COURT:  What soft mare -- software do you use a

2    KMZ file with?

3    A.  Google Earth Pro.

4              THE COURT:  And what does Google Earth Pro produce

5    when you load a KMZ file?  Is it just -- I think you touched on

6    this earlier.  Would it just show you where the relevant cell

7    towers are?

8    A.  Yes.

9              THE COURT:  No perimeter data?

10   A.  No.  The KMZ file that -- that is produced from the software

11   shows the actual perimeter data.

12             THE COURT:  In Google --

13   A.  In Google Earth Pro, yes.

14             THE COURT:  -- Earth Pro?

15   A.  It layers -- it takes the actual Google Earth Pro and then

16   layers the data on top of that, and it --

17             THE COURT:  So what does TRAX add if you already have

18   the location, the map, and the perimeter from Google Earth Pro?

19   A.  TRAX --

20             THE COURT:  In the KMZ data.

21   A.  TRAX is a software that produces the actual KMZ with that --

22   with that layered information with the -- with the perimeter and

23   the actual -- the actual cell site.  So it's user friendly, and

24   you can see --

25             THE COURT:  Does the phone company produce data in KMZ

1    form?

2    A.   No, Your Honor.

3              THE COURT:   So what does the phone company give you?

4    You said an Excel?

5    A.   It's an -- it's an Excel-type file.  It's actually a CSV

6    file, but it's --

7              THE COURT:   Yeah.  Okay.  So you get the CSV from the

8    phone company, and then how do you get to KMZ?

9    A.   You -- or I dump it into TRAX, and TRAX produces the actual

10   KMZ.

11             THE COURT:   Okay.  So when you get that CSV file from

12   the phone company, before you do anything with KMZ, TRAX,

13   Google, what do you know -- what sort of analysis would you do

14   based on the CSV information from the phone company?

15   A.   Well, typically, the return is sent in an e-mail from -- or

16   if -- in an e-mail from, for example, T-Mobile, and they will

17   have the actual CDRs, which are -- which are the CSV file.

18   BY MS. GOMEZ:

19   Q.   The CDR, you mean call detail records?

20   A.   Yes.  I'm sorry.  Yeah.  The actual call detail records,

21   which are the CSV file.  It will have subscriber information.

22   They'll have a business certification.

23             THE COURT:   Okay.  And then?

24   A.   And then I will take the CDR, which is the information that

25   has date and timestamp and lat and long, and ingest it into the

CROSS - O'DANIEL

```
 1    TRAX software.
 2              THE COURT:  Have you ever performed historical cell
 3    site analysis not using the TRAX software?
 4    A.  I have, and it's -- it's the old school, like, pie shaped.
 5    If it's -- this is the -- this is the parameter, and this is the
 6    parameter, and you could say, "Okay.  You know, this is the
 7    sector, and this is where the sector ends, this is where the
 8    sector begins," and it -- but it's very time consuming.
 9              THE COURT:  All right.  The jurors are all here.  I
10    don't know if you have a couple more questions, because Mr. Renn
11    needs to talk to him as well.
12              MS. GOMEZ:  That's okay, Judge.  I think that he has
13    explained sufficiently.
14                         CROSS-EXAMINATION
15    BY MR. RENN:
16    Q.  So it's your testimony you didn't do the manual pinging,
17    because it was very time consuming?
18    A.  The -- no.  We use TRAX as a --
19    Q.  No.  No.  I understand, and, again, it's not we.  You.  You
20    use TRAX, correct?
21    A.  I use TRAX, yes.
22    Q.  But as the judge asked you, you have done manual mapping; is
23    that correct?
24    A.  I have.  Yes, sir.
25    Q.  And you said it's very time consuming, correct?
```

CROSS - O'DANIEL

1    A.   Yes, sir.

2    Q.   And you didn't do it in this case because it's very time

3    consuming, correct?

4    A.   I didn't do it in this case.

5    Q.   Is there a reason why?

6    A.   Because we have the TRAX software.

7    Q.   Okay.  Cell type, you're talking about the sectors.  That's

8    the three fields; is that correct?

9    A.   They're sectors.  Yes, sir.

10   Q.   Yeah.  There's three of them.  Three hundred sixty degrees,

11   and then a hundred and twenty degrees on the three sectors,

12   correct?

13   A.   Yes.

14   Q.   And it depends on which one of those sectors the phone is

15   pinging off of to give this radius; is that correct?

16   A.   And that -- that is something that -- that TRAX actually --

17   Q.   No.  No.  I don't want to hear about TRAX.  I want to know

18   what you know.

19   A.   Okay.

20   Q.   So --

21          THE COURT:  Well, hold on.  There's no jury in the

22   box.  We're just trying to get to the bottom of it.  This is

23   confusing enough.  I think we understand that, normally, he uses

24   TRAX, and he's testified to what he does -- what he knows and

25   doesn't know.

CROSS - O'DANIEL

1        I appreciate the distinction between what is TRAX and what

2    is not, and I think you-all understand that's where my head is

3    right now.  And so let's just try to get to the matter.  Okay?

4    BY MR. RENN:

5    Q.  What is your educational background?

6    A.  In regard to cell site analysis?

7    Q.  No, sir.  Where did you go to high school?

8    A.  I went to Seneca High School.

9    Q.  Where did you go to college?

10   A.  I went to the University of Louisville.

11   Q.  Did you graduate from the University of Louisville?

12   A.  No, sir.

13   Q.  What was your major?  What were you pursuing at the

14   University of Louisville?

15   A.  Political science.

16   Q.  Okay.  Not science science, not math or engineering?

17   A.  No, sir.

18   Q.  Okay.  And when was it that you were last at the University

19   of Louisville?

20   A.  Approximately 2010.

21   Q.  Okay.  The -- and, again, we're going to go back to this

22   TRAX and this KMZ, and you're getting the records from somebody,

23   T-Mobile, in this case; is that correct?

24   A.  Yes, sir.

25   Q.  And that's the call detail records, correct?

CROSS - O'DANIEL

1   A.  Yes, sir.

2   Q.  And then you are just plugging them into some software, in

3   this case here, the TRAX software; is that correct?

4   A.  Yes, sir.

5   Q.  And then once that becomes this KMZ file, you take that and

6   plug it into Google Maps; is that correct?

7   A.  TRAX actually produces the actual Google Maps, which is the

8   actual KMZ file.

9   Q.  What do you do other than taking that KM -- well, taking the

10  call detail records and then plugging them into KMZ, and then

11  taking KMZ and doing whatever with Google Maps, what do you do?

12  A.  I analyze -- there is a -- so it takes that entire record,

13  and then -- and it spits it out, right?  So we ingest it.  It

14  spits it out.

15  Q.  No.  No.  Not we.  You.

16  A.  Right.  And then I take those records, and I will -- for

17  example, in this case, I made a presentation and an animation of

18  those records with respect to the incidents.

19  Q.  Was that your animation or was that TRAX and Google?

20  A.  That was my animation.  I created the PowerPoint, and I

21  created the animation using TRAX and Google.

22  Q.  And are you aware of the best practices for utilizing TRAX?

23  A.  Yes, sir.

24  Q.  And what are the best practices?

25  A.  To do a drive test.  To do peer review.

1          THE COURT:  Peer review?

2     A.  Yes, Your Honor.

3          THE COURT:  Is that what you said?  What does -- what

4     do you mean by that?

5     A.  To have someone just double-check my work.

6          THE COURT:  Okay.  And did that happen here?

7     A.  No.  I was unable, sir.

8          THE COURT:  Okay.

9     BY MR. RENN:

10    Q.  So you didn't do the drive test, correct?

11    A.  Yes, sir.

12    Q.  And you didn't do the peer review or have someone check your

13    work; is that correct?

14    A.  Yes, sir.

15    Q.  And out of these three hundred times a year, you've only

16    testified four or five times; is that correct?

17    A.  Yes, sir.

18    Q.  Did you have to be qualified through a Daubert hearing?

19    A.  No, sir.

20    Q.  That never came up?

21    A.  No, sir.

22    Q.  Was your testimony in state court or federal court?

23    A.  It was in state court.

24          THE COURT:  Have you ever testified in federal court?

25    A.  I've testified in federal court but not as an expert.

CROSS - O'DANIEL

1           THE COURT:   But about historical cell site location --

2   A.   No.

3           THE COURT:   -- information?

4   A.   No, Your Honor.

5   BY MR. RENN:

6   Q.   And the testing that you had talked about with the company

7   was previously -- or that was purchased by LexisNexis, that's a

8   paid service; is that correct?

9   A.   Yes, sir.

10  Q.   And you went through that company's paid training; is that

11  correct?

12  A.   Yes, sir.

13  Q.   And that's right on their LexisNexis website, 40-hour

14  criminal investigations using cellular technologies.  Are you

15  aware of that?

16  A.   Yes, sir.

17  Q.   And so, basically, all you need here is a laptop and mouse,

18  correct?

19  A.   These are -- yeah.  These are equipment used to --

20  Q.   Yeah.  I'm reading the narrative.

21  A.   For cell site analysis.

22  Q.   Yeah.  And the materials needed for this is a laptop and a

23  mouse, correct?

24  A.   Yes.

25  Q.   Google Earth Pro installed, correct?

CROSS - O'DANIEL

1   A.   Yes, sir.

2   Q.   Microsoft Excel installed --

3   A.   Yes, sir.

4   Q.   -- correct?  And you pay $1,000 a person?

5   A.   Approximately.  Yes, sir.

6   Q.   Okay.  And -- and, again, I can show you this.  This is the

7   website, if you would like to see it.

8   A.   Yeah.  I will -- I will take your word that it's $1,000.

9   Q.   Okay.  And this course provides motivated investigators

10   comprehensive training and evidentiary value of call data -- or

11   call detail records and geolocation data.  And it's open to any

12   sworn investigator, crime analysis, fugitive operator possessing

13   fundamental knowledge of call detail records who wants to

14   advance their proficiency.  That's the class you took, correct?

15   A.   Not through LexisNexis.  It was -- it was through the

16   company that -- that bought -- or that was sold to LexisNexis,

17   but yes.

18   Q.   The ZetX?

19   A.   Yes.

20   Q.   That's similar to this?

21   A.   Yes, sir.

22   Q.   And are you aware of the error rate -- you said that there

23   was an estimate on this area, this radius.  Sometimes it's just

24   wrong, isn't it?

25   A.   Well, what are you -- I don't -- is there more -- something

1    more specific?

2    Q.   Yes.   When you're looking at the cell phones -- the cell

3    site or the cell towers, we may call it, and that radius, there

4    are -- certainly, it's not exact.   We all agree with that,

5    correct?

6    A.   Yes.   It doesn't show a pinpoint area or a pinpoint location

7    of the actual cell phone.

8    Q.   But sometimes it's just wrong; is that correct?

9    A.   If you could show me something, I would -- I would li -- I

10   mean, I just --

11   Q.   Is there an error rate for the TRAX software?

12   A.   I don't know if there's an error rate for the TRAX software.

13   I can -- if I can look at a record, I will say, "Yes, this

14   device was most likely in this area."

15   Q.   Again, you don't know.   You're speculating?

16   A.   About what?

17   Q.   About an error rate.

18   A.   Yeah.   I don't -- I don't know if there is an error rate in

19   the TRAX software.

20   Q.   Right.

21   A.   But --

22   Q.   If somebody --

23   A.   -- what I can --

24   Q.   -- from TRAX previously testified under oath and talked

25   about an error rate, you're not aware of that; is that correct?

CROSS - O'DANIEL

```
1    A.   I'm not aware of that.

2    Q.   Okay.  And are you aware that their best practices would be

3    out in a cornfield somewhere rather than in the city where

4    you're talking about topography, buildings, weather that might

5    affect an error rate?

6    A.   Which is why those loca -- that horizontal plane -- or when

7    you look at that information, those are estimated because of

8    geography, topography, buildings and items of that nature.

9    Q.   But, again, sometimes it's just wrong, correct?  If you know

10   the error rate.

11   A.   Again, I would have to actually look at the device.  And, I

12   mean, for example, you wouldn't say, "The incident occurred

13   here, and he's sitting on cell tower here, here, here, here, and

14   then he hit here for a second and then came back."  No.  That

15   would say it's here, here, here, here.

16             MR. RENN:  I think that's enough, Your Honor.

17             THE COURT:  Yeah.  All right.  Thank you, Detective.

18   A.   Yes, Your Honor.

19             THE COURT:  You can step down.

20   A.   Yes, Your Honor.

21             THE COURT:  Can we bring the jurors up?  Well,

22   obviously, he can't testify to the PowerPoint as it currently

23   exists.  The question is what, if anything, can he derive from

24   those cell records.

25       And, I guess, we don't -- we don't know, because the reality
```

1    is he ran a program, and that's how he produced the analysis for

2    this case, and he is not qualified to testify regarding what

3    that program produced, in my estimation.

4        And so I'd like the United States to think about what you

5    believe he might still testify to, and whether -- and to

6    articulate it in a way that will advise the defendant and the

7    Court of what he might come back and -- and testify to.

8        I don't know if I'm -- if we're ready to make a next step

9    and a definitive ruling right now, because I don't think it's

10   terribly clear what he would -- what he would come back with.

11            MS. LANTZ:  Judge, may I?

12            THE COURT:  Uh-huh.

13            MS. LANTZ:  There have been other instances where a

14   detective who wasn't qualified as an expert at all pulled up

15   Google Earth as a demonstrative in front of the jury and then

16   took the latitude and longitude from the cell phone records

17   provided by --

18            THE COURT:  I don't even --

19            MS. LANTZ:  -- T-Mobile.

20            THE COURT:  -- think he'd have to do that much if he

21   was just using call detail records, right?  They have an actual

22   physical street address right there on the face of them.  And

23   so, presumably, you could use just any old map and an address if

24   you had an expert who was qualified and experienced in working

25   with cell phone data -- call -- call detail records, right?

1              MS. LANTZ:  Right.

2              THE COURT:  But that -- that witness would also have

3      to understand the limitations and the nature of how the cell

4      system operated, right?

5              MS. LANTZ:  Yes.  So I think that he could pull up a

6      map and show each of those cell towers and testify as to that.

7      But, obviously, he wouldn't be asserting to the jury that the

8      device was located right at that particular address.

9              THE COURT:  Mr. Renn, what's your position on him

10     testifying simply to the data that's presented on the call

11     detail records?

12             MR. RENN:  Your Honor, at this point here, I do not

13     believe that this witness is qualified to testify about anything

14     about these cell site locations.

15         And I was able to find, Your Honor, Docket Number 29 filed

16     on March the 4th, 2022, where expert disclosures were due on

17     August the 3rd, 2022.  And to the extent this witness is going

18     to testify about anything, I think he does have to be qualified

19     as an expert, number one, and, number two, then we would be

20     entitled to a summary of what his testimony is going to be under

21     the rules.  So --

22             THE COURT:  All right.

23             MS. GOMEZ:  Judge, providing the -- the cell phone

24     records provide the location of the tower, as the Court said.

25     So a witness just saying, "These are the records.  This is where

1    the tower is," rather than having the jury pour through all of

2    the records, and showing on a map where the towers are located

3    is -- wouldn't be expert testimony from -- from the records they

4    have looked at.

5              THE COURT:  I think it would be, because the records

6    themselves gives a physical address of a tower, and the average

7    juror can't be expected to know what that means, in terms of why

8    a cell phone would ping that tower as opposed to something else,

9    how far away it might be, and what we can and can't know on that

10   basis.

11        So if by -- if by the end of the day or by first -- I think

12   by -- if by the end of the day you could offer Mr. Renn a

13   summary of what he could test -- what, if anything, he could

14   testify to without using the TRAX software, then that would give

15   Mr. Renn an opportunity to understand what sort of testimony

16   might be offered, how he might cross-examine him, and how he

17   might object.

18        I think we all have a pretty good idea, based on this

19   extensive discussion, of what we're talking about here, but what

20   we don't have is this -- a summary that you normally would of

21   the scaled-back testimony.

22        And the reason we're doing this or even considering this is,

23   of course, because Mr. Renn objected to his testimony yesterday.

24   We took the time to flesh out that objection, and I am granting

25   his motion to exclude the testimony based on TRAX software.

1       And so the question is what, if anything, do we do next with

2   this witness who, obviously, has a substantial amount of

3   experience and training in using cell site location information

4   in criminal investigations, but we're not sure exactly what, if

5   anything, he would say.

6       And if you would still like to use that witness, then I

7   think the best step would be -- so we're not shooting in the

8   dark, would be to provide a summary by the end of the day to Mr.

9   Renn.

10      Now, obviously, we are far from the Marquess of Queensberry

11  rule here of dealing with expert testimony.  There have been

12  missed deadlines throughout this case.  Both sides was mistaken

13  about the need for expert qualification.  No one raised an

14  objection until we were in the middle of trial.

15      I understand all this.  I'm trying to do my best to avoid

16  any more prejudice than necessary for either side's case.  All

17  right?  I hope you-all realize that we've worked very hard,

18  since this issue came up at 3:30 yesterday, to try to get to the

19  right spot.

20      And I know this course is not what either of you would

21  prefer, and I'm not saying he -- that I will allow him to offer

22  this testimony, but if the government still wants to try to use

23  him, that's the next step, in my view, would be to disclose by

24  the end of the day to Mr. Renn a summary of what he would

25  testify to without using the TRAX software.  Does that make

1    sense?

2            MS. GOMEZ:  Yes, Your Honor.

3            THE COURT:  Does that make sense?

4            MR. RENN:  It does.  I guess, need to wait, but,

5    again, my fear under this would be under 403, that we're going

6    to get prejudice, because I don't know how he testifies about

7    anything without, on cross-examination, probably, opening the

8    door to this TRAX information again.  So, again, I'll wait and

9    see what the summary is and then make an appropriate objection.

10           THE COURT:  I think -- I think the way to ensure that

11   he didn't testify about TRAX software is that before the jury

12   came in, this judge sitting over his shoulder would glower at

13   him not to mention anything to do with TRAX software, and to

14   limit himself to the four corners of whatever summary that you

15   get.

16       And I know we're talking about process right now.  I'm not

17   asking you, Mr. Renn, to concede to anything, you're not waiving

18   objections, but let's just take this step by step, and if you

19   guys want to go forward on this basis, you can, making a summary

20   disclosure later today.  Okay?

21           MR. RENN:  Yes, sir.

22                      C E R T I F I C A T E

23       I CERTIFY THAT THE FOREGOING IS A CORRECT TRANSCRIPT FROM

24   THE RECORD OF PROCEEDINGS IN THE ABOVE-ENTITLED MATTER.

25       _____s/Rebecca S. Boyd_____         December 1, 2022
         Official Court Reporter                Date

1                                    INDEX

2
     GOVERNMENT WITNESS:
3
     **DETECTIVE TIMOTHY O'DANIEL**                              PAGE
4
         Direct Examination by Ms. Gomez                         28
5        Cross-Examination by Mr. Renn                           41

6
     No exhibits
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25